EX PARTE E. H. BROWN.

April 29, 1879.

1. Telegraphic messages, or their contents, are not exempt from the process of the court.

2. The manager of a local telegraph-office, when properly served with process, cannot refuse to produce dispatches called for, on the ground that to do so would be in violation of his duty to the company; and the court does not exceed its jurisdiction in committing the witness for a contempt in refusing to obey the subpœna.

3. A call, in a subpœna issued by the grand jury, for any and all messages passed between certain named parties during the last six months, is sufficiently certain without reference to the subject-matter of the dispatches.

4. The statute having reference to the punishment of any officer or servant of a telegraph company for the disclosure of the contents of any dispatch does not apply to a case where the dispatches are produced in answer to legal process.

*Per* Lewis, P. J., *dissenting:*

1. A *subpœna duces tecum* must give such a description of the paper to be produced as will serve to identify it as the particular paper called for.

2. A call for "any and all telegraphic dispatches" which have passed between certain named parties, or "which may have been sent or received by or between any or all" of the parties named, "within the last six months," does not sufficiently describe the papers, and should not be enforced.

4. A subpœna which calls for a considerable number of papers, for the manifest purpose of ascertaining whether any of them may be found to be material to the matters under judicial investigation, is a search; and if calculated to compel the production of private papers not material, is unreasonable, within the meaning of the constitutional inhibition against "unreasonable searches and seizures."

Petition for *habeas corpus.*

*Petitioner remanded.*

E. T. Allen and J. G. Lodge, for petitioner.

L. B. Beach and J. N. Harris, *contra.*

Hayden, J., delivered the opinion of the court.

The contention on the part of the petitioner is that it affirmatively appears on the face of the papers that the Criminal Court, by which the petitioner was committed for contempt, exceeded its jurisdiction in committing for the supposed offence. The only contempt, it appears, was the petitioner's refusal to search for and produce certain telegraphic dispatches alleged to be in the office of the Western Union Telegraph Company in the city of St. Louis, of which company the petitioner is manager in that city, in obedience to a *subpœna duces tecum* issued by the Criminal Court at the instance of the grand jury for the city of St. Louis. This subpœna commands the petitioner to appear before the grand jury, and there testify in a matter pending before them, and there to produce "any and all telegraphic dispatches or messages, or copies of the same,

now in the office of the Western Union Telegraph Company, of which you are manager, and which dispatches and messages are now in your possession and under your control," etc. Here various persons are named as persons between whom dispatches passed, thus : " Between Dr. J. C. Nidelet and A. B. Wakefield, and William Ladd and J. C. Nidelet," etc., and the subpœna, after thus naming the persons, continues, " and any and all telegrams    *    *    *    or copies or originals that may be in your possession,    *    *    * which may have been sent or received by or between any or all of the above-mentioned parties within the last six months," etc. In obedience to the writ, the petitioner appeared and testified before the grand jury ; but, for reasons noticed below, declared, in answer to questions put, that he refused to examine the files of the company in the office of which he was manager, for the dispatches or copies. It appeared that these inquiries were made with a view of finding indictments against persons other than the petitioner, for offences committed within the proper jurisdiction. The petitioner, being admonished in open court, and still refusing, was committed as above stated. On the part of the petitioner the attempt is made to put his case on the broadest grounds, and the general questions involved will therefore be considered at first without reference to authorities.

It is evident that there is no foundation for the position of the petitioner as to the exemption of these messages in any natural right, even if he is considered here as representing the senders and receivers of these telegrams, as well as his own company. Whatever may be said as to a man's thoughts, where, by communication on his part, those thoughts pass into the region of action, it becomes a mere matter of political regulation how far the State will go in compelling evidence of that action. The very provision — perhaps universal in the constitutions of our States — against unreasonable searches and seizures, and general and indefi-

nite warrants, shows what primordial rights the individual has been willing to surrender to the State, even where the privacy of home has been invaded.

The people, in their fundamental law, expressly provide that even this sanctity shall not remain inviolate against the hand of criminal justice. This provision of our Constitution, however (Const. Mo. 1875, Bill of Rights, art. 2, sect. 11), has little bearing upon the present question, except by way of argument and illustration. The general warrants of England and the writs of assistance of this country involved questions of a different nature from those relating to the social acts of the accused parties. Apart from the general nature of the warrants, which was the great evil and the decisive ground of illegality, — a truth which is perpetuated in the language of the constitutional provision, — the point was the indiscriminate seizure of all papers which the accused preserved in the privacy of his home, and the illegality of compelling, by force, communication of the contents of those papers ; thereby constraining the person, so far as the papers availed against him at all, to be his own accuser.

The difference is too obvious to be dwelt upon where the communication is the act of the person himself. It is said, indeed, that the communication by telegraph is not voluntary, as it is made, not because the person desires it, but because he must, in order to so communicate, put the operator in possession of the facts. Cooley's Const. Lim. *307, note 1. But that the act of the person in thus communicating is, in the legal sense, a voluntary act, is apparent. The will of another does not, as it did in the case of Wilkes ( *Wilkes* v. *Wood*, Lofft's Rep. 1), disclose the contents of the papers. There is precisely the same voluntariness in the act of the sender of a telegram, however much he may dislike sending the message, that there is in the act of the principal who, driven by necessity, utters in presence of his agent secrets the disclosure of which may ruin the princi

pal's business. In such a case the principal does not receive protection against disclosure by the agent, on the ground that the act of communicating was against the principal's will. Whether made in writing or orally, the act of communicating, as such, is an act of the person ; and a man's acts are evidence against him.

The act of sending and that of receiving thus subjecting the persons to the ordinary consequence of having their acts used as evidence against them, why should there be an exception in case of communication by telegraph? It is not claimed that the relation ot the parties or the subject-matter of the messages forms any ground of exception similar to that existing in case of husband and wife, or attorney and client.

The question is merely of the production of the dispatches as such. If the parties to them or their subject-matter afford legal grounds of objection to the admission of their contents in evidence under established rules, such objections can be made when the telegrams are produced.

Here the question is of the mere production, and the contention is that that production cannot be compelled. To their production as telegrams there can be no objection on the ground of parties or subject-matter. A ground taken, however, in argument is that the sender and receiver desire their messages to be kept secret. But even this is an assumption. Where, as here, we are bound to believe that it is necessary for the purposes of criminal justice that the best evidence should be produced,—and the ability of courts of law to protect life and property must largely depend on the production of the best evidence,—it ought rather to be assumed, as the telegraph company undertakes to retain custody of the originals long after the transmission, that there could be no objection to their production for lawful purposes. It is in fact, so far as we can know, the company who resists production, not the parties to the dispatches.

But even if the assumption is allowable, in such a case as the present, that sender and receiver object to the production, what does this objection amount to when tested by legal principles? Communications regarded by the parties as sacred, — those from father to son, from brother to sister, from partner to partner, the closest secrets of the family or the firm, — the law ruthlessly lays bare. On none of these grounds is the position tenable. The argument bases itself on the mere method of communication.

It is, then, in the physical means that we must find reasons for the conclusion that a new rule must be adopted exempting telegrams in a company's hands from a well-settled course of practice as to the writ of *subpœna duces tecum.*

The argument at this point centres on an assumed analogy between communication by government post and by telegraph. It is difficult to discern either physical or legal basis for this argument. The sender by post does not select a method by which he communicates the contents of his package even to the officers of the government, much less to a mere private person or company. The sender by post does not necessarily send any message at all, but perhaps only enclosures. He transmits a package in bulk.

The sender of a sealed package, by the mere method chosen, preserves its contents as private, until the receiver unseals it, as if the package had never left the sender's desk; and such is the legal effect. *Ex parte Jackson*, 96 U. S. 727. The physical analogue of the telegraph is rather the telephone, since both, in their essential parts, are methods, not by which packages of contents unknown to the carrier are sent, but by which, through a substantial medium, persons at great distances from each other may converse.

It is true that writing becomes essential to telegraphy as a business, but the question now is as to the closeness of the physical analogy. The argument serves to show there is little foundation for comparison with the post, and to re-

mind us that original telegrams are not "papers," otherwise than as any open messages might be so called, which, for convenience in communicating them to the messenger, had been written on pieces of paper. That the sender by telegraph is forced to communicate the contents to the operator is immaterial, since the sender chooses to telegraph. In a legal sense, the act and its concomitants are voluntary. The legal basis for comparison with the post is still less. Communication by post depends upon provisions of statutory law, and these statutes do not apply to the telegraph. It is said that no statute expressly forbids the production before the grand jury of letters from the government mails. But the post-office laws are inconsistent with such production; nor could the mails be carried if, in every State, the right of search were exercised. Again, it is not only under powers delegated by the people of the States to the Federal government that the latter has undertaken the control of the mails, but Congress has practically made the post a government monopoly. Even if it be held that the constitutional grant extends to telegraphs (*Pensacola Tel. Co.* v. *Western, etc. Tel. Co.*, 96 U. S. 1), the power has not yet been exercised. The post-office, in the sense of the mail-service, is a department of the Federa government, and with the mails, as they are carried under acts of Congress, the States cannot directly or indirectly interfere. By what authority can it be assumed that a private person or company, engaged in the business of telegraphy, stands in relation to the State governments as does the Federal government when acting under express laws? But even the Federal government assumes no such privileges, as against the States and their legal process, as the private companies engaged in the business of telegraphy. What the post-office department undertakes to do is merely to carry and deliver, not to retain for its own purposes and at its pleasure, "the best evidence" of a vast number of transactions. Letters are privileged only for the brief time

they are in transit, and they become, when delivered, subject to the process of the courts. They have no inviolability as " papers," but merely as mail communications in transit.

Again, for the government to allow seals to be broken open would be for it to violate trusts. It could not, without breaking faith with those whom it virtually compels to send their letters by mail, permit seals to be broken under its own or under State process. It is not merely that a law exists punishing an offender who breaks the seal of a letter in the mail, — it is that the seal itself is a recognized type of inviolable secrecy, and that by a custom well established. Both in this country and England the powers of State refrain, even where special acts give an exceptional authority, from opening sealed packages intrusted to the government for carriage. But no such type of secrecy, and no such trust or custom exists in the case of the telegram. The sender, the receiver, and the company know that, upon due process of law, the original messages and copies — which the company has chosen to keep, and to take the consequence of keeping — must be produced, for such is the law.

By our statutes it is provided that any person connected with any telegraph line constructed wholly or in part in this State, either as clerk, operator, etc., who shall wilfully disclose the contents, or the nature of the contents, of any message or communication intrusted to him for transmission or delivery, *except to a court of justice*, to any person other than the one to whom it is addressed, or to his attorney, or agent, etc., shall, upon conviction, be punished, etc. Wag. Stats. 507, sect. 51. By a clause in another section of the statutes it is provided that every telegraph company, etc., shall be liable for a penalty, and special damages in addition, for the disclosure of the contents of any private dispatch to any person other than to him to whom it was addressed, or to his agents, etc. Wag. Stats. 325, sect. 13.

If the provision first quoted did not exist, the last would raise no intendment in favor of the 'position of the petitioner. The object of this last provision is obvious. To stretch it beyond its express meaning, and assume a policy of law, is to beg the question. Besides, the construction of such acts is well settled. It is understood that there is always an exception in favor of legal process. Here the company, when called upon by the courts, discloses the contents of no dispatch. If the contents are disclosed, — and it does not follow that they will be, — the disclosure is the act of the law, not that of the company. As said by Lord Ellenborough in a parallel case, where the clerk of an official had, on entering upon his office, taken an oath not to disclose anything he should learn in that capacity, " there is an implied exception of the evidence to be given in a court of justice, in obedience to a writ of subpœna. The witness must produce the book, and answer all questions respecting the collection of the tax, as if no such oath had been administered to him." *Lee* v. *Birrell*, 3 Camp. 337.

After what has been said, it is unnecessary to dwell upon the consequences which would follow if the production of telegrams — great as this mass of evidence is, and relating to transactions infinite in number — were not left to that uniformity which can be secured only by a fixed rule of law. Since the evidence may be competent (if it can only be obtained), and, if competent, the court would have no power to exclude it, the guilt or innocence of an accused person is made, on the theory urged, to depend, not upon the operation of a rule of law which is uniform in every case, but upon private interest or caprice. Certainly, if telegrams are to be produced in any case of a criminal nature, there should be the power of compelling their production in all cases. Evidence of this kind should be uniformly admitted when competent, or uniformly excluded. Nor is it necessary to do more than to advert to the fact that if the great avenues through which the business of the community

passes, and in which evidence remains, are to be closed to the process of the courts ; if, as new methods of communication spring up, the courts are to be debarred from these sources of truth, they are, so far forth, liable to fail in the chief purpose which they are created to accomplish. Undoubtedly, great inconveniences may arise to the telegraph companies through *subpœnas duces tecum;* but that the companies have original evidence of transactions in their possession is the necessary result of the business as they carry it on, and they, like others, must submit to those annoyances which are consequent upon the execution of the laws.

Thus we have reached the conclusion that upon principle, and apart from authority, the position of the petitioner is not tenable, while so far as adjudged cases are produced they are uniformly to the effect that there is no peculiarity in the telegraphic messages, as such, which exempts them or their contents from the process of the courts. *The Commonwealth* v. *Jeffries*, 7 Allen, 548 ; *National Bank* v. *National Bank*, 7 W. Va. 544 ; *The State* v. *Litchfield*, 58 Me. 267 ; *Heinslee* v. *Freedman*, 2 Pars. Sel. Eq. Cas. 274 ; *Incess Case*, 2 L. T. (N. S.) 421. That telegraphic communications should be regarded as privileged is maintained by Judge Cooley. Cooley's Const. Lim. *307, note 1 ; Am. L. Reg. 65, (February, 1879). In *United States* v. *Babcock*, 3 Dill. 567, the question above discussed was not raised.

What has been said serves to show that it is no excuse for the petitioner that to comply with the writ would require him to neglect his duties to the company, or that he has been instructed by his superior officers, and by his employers, the company, not to produce the telegrams. Nor can he urge that he has no control over these dispatches, because his duty is merely to keep them as directed by the company. He is, as he testifies, the manager of the St. Louis office, and as such has the custody and control of the dispatches or copies called for, if there are any such tele-

grams or copies in his office ; and for these he has refused to search. The present is not the case of a clerk or subordinate summoned to produce papers not under his control. *President, etc.* v. *Hillard*, 5 Cow. 153 ; *Austin* v. *Evans*, 2 Man. & G. 446. The company is here a corporation, which can act only through agents ; and service need not necessarily be upon the president, but may be upon the person who has the actual control, and means of effectually responding to the writ. *Amey* v. *Long*, 1 Camp. 14 ; *s. c.* 9 East, 473 ; 1 Arch. Q. B. Pr. 170. Undoubtedly, in civil cases, where the operation of the writ of *subpœna duces tecum* would be harsh, the power will be exercised in the sound discretion of the court. *Crowther* v. *Appleby*, L. R., 9 C. P. 23 ; *Attorney-General* v. *Wilson*, 9 Sim. 526 ; *Lee* v. *Angas*, L. R. 2 Eq. 59. It is further urged that there is no sufficient or certain description of the papers required, and that the call is for " any and all " messages which may have passed between the parties named, during the last six months, without reference to facts or subject-matter. But the obligation of secrecy imposed by law upon the grand jury is sufficient answer to the objection that the subject-matter of the dispatches is not indicated. Wag. Stats. 1083, sects. 16, 17. By agreement, the subpœna is considered to describe each day as if each day were named, and it is impossible for us to say on what days dispatches have passed, or that there have not passed dispatches on each day thus described. As the jurisdiction of the Criminal Court was not exceeded in committing the petitioner for the contempt charged, the petitioner must be remanded, and remain in the custody of the marshal.

Judge BAKEWELL concurs ; Judge LEWIS dissents.

Dissenting opinion delivered by LEWIS, P. J.

I am unable to concur in the conclusion reached by a majority of the court. So far as it is maintained that in this State telegraphic dispatches, as such, in the custody of

the operator are no more beyond the reach of a *subpœna duces tecum* than any book or paper in the hands of a private individual, I have no difficulty in assenting to that proposition. But I am convinced that the process to be enforced in the present case is framed in utter disregard of recognized essentials of the *subpœna duces tecum*, and in violation of the constitutional guaranty against " unreasonable searches and seizures." The writ commands this petitioner to produce " any and all telegraphic dispatches, or messages, or copies of the same, now in the office of the Western Union Telegraph Company, of which you are manager, and which dispatches and messages are now in your possession and under your control, which have passed between Dr. J. C. Nidelet and A. B. Wakefield, and William Ladd and J. C. Nidelet, * * * and any and all telegrams, or copies, or originals, that may be in your possession, which may have been sent by or between any or all of the above-mentioned parties within the last six months." The last clause would include all the dispatches which have passed, within the time stated, between either of the persons named and any other person or persons whomsoever.

The right of privacy with respect to one's personal affairs is, in many cases, as dear and as inseparable from the enjoyment of good government and free institutions as any right of property or of personal security. The law does not more certainly protect a man against the spoliation of his farm, or the mutilation of his body, than it does against the compulsory exposure of private communications between himself and his wife, or of those held with his attorney or medical adviser. Business or family secrets, not belonging to the privileged classes, are often of more vital importance to the interests or the happiness of individuals than some of those which the law screens absolutely from judicial inquiry. In nearly every relation of life there are concerns of which exclusive knowledge in particular persons is proprietary, and whose unrestrained exposure would be

destructive of individual peace and prosperity, and might even lead to most serious consequences in the conditions of society. In trade, the exclusive information gained by superior enterprise is often the most valuable possession of the man of business, while a publication from day to day of his private affairs would bring him to speedy ruin. A system of laws which should treat with entire indifference such momentous interests — not to say rights — of the citizen, would disgrace any civilized people.

No such indifference is apparent in the law which prevails in Missouri. Its absence is conspicuous in the checks and guards which preclude any prying into books, papers, or even chattels of any sort in private possession, unless really necessary for the public welfare. It is true, at the same time, that our law holds in yet higher esteem the great public interest which is formulated in the administration of justice. When the two come in direct competition, the private must yield to the public interest. The merchant, whatever reasons he may have for withholding his ledger, will be compelled to produce it for the ends of judicial inquiry. But when and on what terms will the privacy of his accounts be thus ruthlessly sacrificed? This may occur when, and only when, the tribunal making the demand has been first satisfied, by at least a *prima facie* showing, that the contents of the particular ledger called for are material to the inquiry in hand. A court or officer dragging forth by compulsory process the books or papers of a citizen, which are not supposed to be material to an authoritative inquiry actually pending, will be guilty of an intolerable abuse of power.

The so-called *subpœna duces tecum* in the present instance announces upon its face that no test of materiality has sanctioned its issuance. It postpones that test to a time when it will be useless to apply it. It invades the domain of lawful privacy in order to find out how far the invasion may be justified by subsequent discoveries. It

proposes violence, without lawful authority, upon a mere guess at the possible disclosure of some authority after the mischief is done. There is no precedent for such a process in any department of the jurisprudence under which we live.

All the authorities insist that a *subpœna duces tecum* shall particularly describe the book or paper to be produced. This will convey a proper certainty to the person who is to obey the subpœnâ. It does more : it shows that the authority which issued the writ has taken due cognizance of the character of the book or paper, and determined its materiality to the pending issue. A single paper — say a telegraphic dispatch — may be sufficiently described by its date and the names of the sender and receiver. So of any number, if each is described in the same way. Such a description, though not perfect, may serve to identify the paper or papers which the court has considered in making the order, and may even suggest an acquaintance with the contents thereof. But in the case before us not a single paper is described by its date, or by the name of its sender or receiver as such. The lumping together of *all* dispatches sent either way between numerous parties, or by any of them to other parties, or received by any of them from other parties, at any and all times in the course of six months, is a mere burlesque on specific description for any of the objects contemplated by law. If such a wide range of dates and of persons be allowable, why not as well admit six years, or one thousand persons? And if the writ may include these, why may it not cover all time and all mankind? The writ, as here framed, prepares a precedent for the compulsory production of *all* the papers in the telegraph office, without a more specific description of any, and so opens the way for the very system of usurpation and oppression which was so eloquently denounced by Lord Camden in the case of Wilkes. This subpœna is calculated to gather up all the dispatches, within the time stated, upon

every variety of subjects, whether political, legal, social, or otherwise, discarding all idea of discrimination among them because of materiality or the contrary. They may include any number of communications between attorneys and their clients, or others equally privileged against judicial exposure. There may be messages of the most exclusively private nature, which no authority should meddle with unless for the manifest ends of judicial administration, and which may yet have not the remotest bearing or influence in that direction. The admitted object of the process is that the mass may be sifted, and only such dispatches be retained as shall be found relevant and material. But how is it possible to separate the material ones without examining also those which are immaterial? To say that the sworn secrecy of a grand jury will furnish sufficient protection on this point is to beg the whole question. If a legal guaranty of privacy exists at all, under any conditions, it is not that a man's secrets shall, against his will, be given up only to the trustworthy or the oath-bound, but that they shall not be given up at all. Among the members of a grand jury may be the very persons, of all others, whose prying into one's private affairs will work him the greatest amount of injury. Lord Denman, in *Doe* v. *James*, 2 Moo. & R. 47, when asked to examine a will left with an attorney by his client, and thus to ascertain whether it was a will of personalty, and so not within the privilege of professional secrecy, answered : " I do not think that a judge has any more privilege to examine the document than any one else. I cannot call on the witness to produce it."

The proceeding which this writ proposes to institute amongst a mass of telegraphic messages, for the purpose of finding out if some of them may be of a particular character, is literally nothing less than a *search*. If, then, it be " unreasonable," it falls exactly within the prohibitions of the State and Federal Constitutions. What sort of search could be more unreasonable than one whose direct tendency

is toward results vexatious to the citizen, and yet without a shadow of benefit to the public? The production of a single dispatch of a purely private nature, having no relevancy to the pending matter of judicial investigation, would exemplify just such a result. How many of such messages may be thus unlawfully, vexatiously, and unprofitably exposed to scrutiny under this proceeding, it is impossible to guess.

Constitutional law forbids the issuing of any warrant for a search or seizure except " upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." In complying with these conditions, great particularity is always required. The suspicion of probable cause, supported by oath or affirmation, will not suffice, unless also such facts be shown as will satisfy the magistrate that the suspicion is well founded. *The Commonwealth* v. *Lottery Tickets*, 5 Cush. 369. A designation of goods to be searched for as "goods, wares, and merchandises," without more particular description, is held to be insufficient. *Sandford* v. *Nichols*, 13 Mass. 286. In interpreting the personal guaranties of the Constitution, it is a cardinal rule that substance be always attended to rather than form. The writ here present, by whatsoever name it may be called, is designed to effect both a search and a seizure. Whatever may be said of the origin of the guaranty under consideration, I fail to perceive that the constitutional restriction is limited to " the indiscriminate seizure of all papers which the accused preserved in the privacy of his home." Why should there be a distinction between a man's home and his warehouse, or his ship, or any other place where papers may be lodged? A man may intrust to a private secretary, living in his house, all his private papers. They will still be in the home of the owner. But suppose the secretary removes them to a different place. Will that fact dismiss them from all protection of the law? The custody of the secretary is still the custody of the owner, and carries with it, for the

owner's benefit, whatever rights of privacy he might claim if the keeping had remained with himself. By what magic will a different rule be evolved when the owner has, from necessity, made the telegraph operator his confidant, instead of a private secretary?

The constitutional exactions in the case of every warrant for the search of property are understood as formulating plain principles of civil liberty. Can any man discern the difference between the flagrancy, in principle, of such a warrant issued without the defined requisites, and that of a writ which compels the production of private papers, and their exposure to strangers, without a preliminary showing of materiality, and without a specific description which shall identify the material and leave the immaterial papers untouched? The same principle of civil liberty is violated in either case, and courts should never, in such an event, indulge in nice distinctions between what is commanded in written words, and what is of equal obligation in the unwritten laws of truth and justice.

I am of opinion, notwithstanding the well-expressed views of my learned associates, that the *subpœna duces tecum* in this case bears upon its face the odious features of the general warrant which the framers of our government intended to banish from American jurisprudence; that its execution ought not to be enforced by any court; and that the petitioner should be discharged from custody.