## Ex Parte Brown.

1. **Compulsory Production of Telegraphic Messages in Court**: LIABILITY OF COMPANY'S AGENT TO PUNISHMENT FOR REFUSAL. Telegraphic messages in the possession of the officers of the company, are not privileged communications. No act of Congress puts them on the same footing with the mails; and no statute of the State or principle of law gives them any different standing from that occupied by any communication made by one through another to a third party, with respect to the liability of the confidant to be called as a witness to produce it or testify to it. The agent of a telegraph company may, therefore, be compelled by proper process to produce such messages before the grand jury; and no rule of the company can excuse him from liability to punishment for refusal so to do.

2. ——: CERTAINTY OF DESCRIPTION OF PAPERS REQUIRED IN SUBPŒNA DUCES TECUM. A subpœna *duces tecum* to compel the production of telegraphic dispatches should give a reasonably accurate description of the papers wanted either by date, title, substance or the subject to which they relate. The following description is not sufficiently certain: Dispatches between Dr. J. C. Nidelet and A. B. Wakefield, and William Ladd and J. C. Nidelet, and William Ladd and Dr. Nidelet, between Warren McChesney and A. B. Wakefield, between Warren McChesney and J. C. Nidelet, between the latter and John S. Phelps, between A. B. Wakefield and John S. Phelps, between the latter and William Ladd, and between Geo. W. Anderson and A. B. Wakefield, sent or received by or between any or all of said parties within fifteen months last past.

### Habeas Corpus.

*Edmund T. Allen* for the petitioner.

1. There was no fact stated in the application for the subpœna *duces tecum*, or in the subpœna prayed for, or in the report of the grand jury, upon which the commitment issued, tending to show: 1st, That the papers called for were in existence. 2nd, That if in existence, they were necessary evidence in any matter pending before the grand jury. 3rd, That if in existence, they were relevant, or material, or competent evidence in any matter pending before the grand jury.

2. The subpœna required the production of all the telegrams which had passed between the parties named, during the period mentioned, without reference to whether or not they were relevant or competent evidence.

3. The papers called for were ordered to be produced and exhibited, not to the court for its determination as to their relevancy or competency, and their consequent exposure, but to a grand jury, a body unauthorized by law to exercise any such judicial function.

4. The issue of such a subpœna, under such circumstances, was prohibited by the 11th section of the bill of rights of this State. (a) History of this provision and its effects. *Wakely v. Hart*, 6 Binney 316, p. 319; No. 84 Federalist, (Ed. 1864,) p. 631; Story Const. Law, §§ 304, 1838, 1861; Pomeroy Const. Law, § 238. (b) The first clause is complete in itself, and forbids any unreasonable search or seizure. (c) It is left to the judiciary to determine what are reasonable searches and seizures, and what is probable cause for making a reasonable search. (d) Any interference with the books and papers of a person, not a party to any proceeding pending in court, is unreasonable, unless: 1st, His books or papers are necessary evidence in such proceeding. 2nd, They are material and competent evidence in the investigation pending. Thus, the same rule is deduced from an analysis of the 11th section of the bill of rights as was attained by Mr. Hitchcock from *Amey v. Long*, 9 East 473, in his paper in 5 South. Law Rev. (N. S.) 473. *Hall v. Young*, 37 N. H. 134; *Morrison v. Sturges*, 26 How. Pr. 177; *Wilkie v. Moore*, 17 How. Pr. 480, *People v. Rector of Trinity Church*, 6 Abb. Pr. 177; *Commercial Bank v. Dunham*, 13 How. Pr. 541; *Davis v. Dunham*, 13 How. Pr. 425; *Cassard v. Hinman*, 6 Duer 695; *Smith v. McDonald*, 50 How. Pr. 519; *C. C. R. R. Co. v. 23rd St. R. R. Co.*, 53 How. Pr. 45; *Mott v. Consumers' Ice Co.*, 52 How. Pr. 150. The court could not delegate to the grand jury the delicate function of passing upon the necessity for and the relevancy of these papers, and the resulting reason-

ableness or unreasonableness of their production. *Whitcomb's case*, 120 Mass. 118.

5. The statute imposing secrecy upon the grand jury affords no reason why the court should not have been put in possession of all the facts, necessary for it to determine the reasonableness of the demand for these papers. If such was its intention, it must yield to the constitutional provision. *People v. Kelley*, 24 N. Y. 74; *s. c.*, 1 Am. Law Reg. (N. S.) 534.

6. History of controversy as to production of telegrams by the telegraph company, under subpœnas *duces tecum*, so far as relates to their immunity as telegrams. *U. S. v. Babcock*, 3 Dill. 567; *Barnes' case*, in Congress; *Smith's case*, Kansas Legislature. (1) Importance and extent of telegraphic communication. *Pen. T. Co. v. W. U. T. Co.*, 96 U. S. 9. (2) Comparison with letters in mails. (3) Immunity of letters rests upon 4th Amend. Fed. Const. *Ex parte Jackson*, 96 U. S. 733. It has " grown out of the custom of the people." Lieber's Civil Liberty and Self Gov., vol. 1, ch. 9; English History of " Free Letter ;" May's Const. History, vol. 2, p. 279, *et seq;* Chamber's Encyclopedia, Article Post. (4) Immunity of letters does not rest simply upon a trust assumed by the Government. It is an inherent right, and relates to letters in transit, whether in the mail or by private carrier. U. S. R. S., § 3993; Mo. R. S., §§ 1584, 1585, 1586. (5) As a method of communion, it is a primordial right. Lieber on Civil Liberty, etc., ch. 9, p. 108, *et seq*; Ch. 22nd, pp. 287, 288, 290; Lieber's Political Ethics, (2 Ed.) § 47, p. 183; also § 34, p. 162; § 55 p. 200; § 56, p. 202. (6) As methods of communion the letter and telegram, so far as the incidents of transmission are concerned, should stand upon the same basis. (*a*) That the government sends the letter, and a private corporation the telegram, does not affect the principle. 96 U. S. 1. (*b*) Objections of inconvenience, such as that the courts would be debarred from access to evidence, are not valid. Lord Lyttleton's argument in House of Lords, 15

Hansard's Parl. Hist., 1355, 6 *et seq.* Same argument made in favor of general warrants of arrest, and wholesale seizure of books and papers. Parl. Hist., 1402; Id., vol. 16, pp. 8, 10. The courts, since the last century, have gotten along without letters abstracted from the mail. They will do equally well without the telegram taken from the telegraph office. It has been thought better that the State should be unable to punish crimes in certain instances, than that the rulers should have the power, through a perversion of judicial proceedings to oppress and wrong the people. Pomeroy on Const. Law, § 257; Cooley on Const. Lim., (4 Ed.) 303; 18 Am. Law Reg. 65.

*J. G. Lodge* also for petitioner.

1. A subpœna *duces tecum* will only be allowed to issue upon a reasonable showing that the papers sought exist, and that they are not privileged, and that they are necessary and material in the case in which they are sought to be used. In every instance it is a question for the judge to whom the application is made for the subpœna, to decide upon grounds of "reason and equity" whether it should issue or not. *Amey v. Long,* 9 East 473, 484; *U. S. v. Babcock,* 3 Dill. C. C. 567.

2. Petitioner is a mere servant of the telegraph company, having no control over any message in the office of the company. All messages are in the possession of the company; and its rules forbid the petitioner from delivering messages to any one except the person addressed. He cannot take them before the grand jury without disobeying the orders of the company. *Bank of Utica v. Hillard,* 5 Cow. 419; *Bank of Utica v. Hillard,* 5 Cow. 158; *Crowther v. Appleby,* L. R. 9 C. P. 23; *Earl of Falmouth v. Moss,* 11 Price 455; *Attorney General v. Wilson,* 9 Simons 526; *Lee v. Angas,* L. R. 2 Eq. 59; *Wright v. Mayer,* 6 Ves. Jr. 280; *McCann v. Beere,* 1 Hogan 129; 2 Daniels Chancery Pl. and Prac., 1376; *Miles v. Dawson,* 1 Espinasse 405; *Bate-*

*son v. Hartsink*, 4 Espinasse 43; *Austin v. Evans*, 2 Man.
& Grang. 430 ; *LaFarge v. LaFarge Fire Ins. Co.*, 14 How.
Pr. R. 30 ; *Woods v. DeFiganiere*, 16 Abb. Pr. R. 160 ; *Murray v. Walter*, 1 Cr. & Ph. 114.

*J. L. Smith*, Attorney-General, for respondent.

1. Telegraphic dispatches in the possession of the
officers of the company are not privileged communications,
and their production can be compelled as other writings.
*Henisler v. Freedman*, 2 Pars. Sel. Cas. 274; Scott & Jarn.
on Tel., § 378, note; *State v. Litchfield*, 58 Me. 267 ; *Bank
v. Bank*, 7 W. Va. 544 ; *U. S. v. Babcock*, 3 Dill. C. C. 567 ;
*Ince's case*, 20 Law Times (N. S.) 421 ; *Ex Parte Brown*, 7
Mo. App. 484 ; *s. c.*, 8 Cent. Law Jour. 378 ; Scott & Jarn-
agin on Tel., § 377, *et seq;* 5 Congressional Record, pt. 1,
44th Cong., 2nd Sess., pp. 325, 330, 352, 358, 439, 449, 452,
455, 476, 477, 512, 514, 602, 608, 629, 631, 678, 694.

2. It would be an anomaly, indeed, if a private cor-
poration could make a rule which, in terms, nullifies
process issued by a court of justice; and when the law
demands and calls for certain evidence, a telegraph com-
pany can defeat that demand by a rule enacted by itself.
This was no reason whatever for a refusal to obey this writ.
*Ince's case*, 20 Law Times (N. S.) 421. It is of no conse-
quence who has the legal custody of the writing, if it is
in the actual possession of the witness. *Amey v. Long*, 9
East 473 ; *Chaplain v. Briscoe*, 5 Sm. & Marsh. 198, 208.
See remarks of Mr. Knott, 5 Cong. Rec. 358.

3. The statement in the application for the subpœna
that the telegrams are in " the possession of said Brown
and are needed as evidence, and are material in certain
matters now pending before the grand jury now in session
and over which they have jurisdiction; said matter and
inquiry being had with a view of finding an indictment,"
is at least a *prima facie* determination that the telegrams
are in the possession of the witness, and that they are ma-

terial to a matter now pending before the grand jury, which they are investigating with a view of discharging their sworn duty. This complies with even the most extreme view that has of late been taken against the sufficiency of general descriptions of papers sought to be reached by subpœna *duces tecum*. Hitch. on Inviol. Tel., p. 36, *et seq.* "The papers are required to be stated or specified only with that degree of certainty which is practicable, considering all the circumstances of the case, so that the witness may be able to know what is wanted of him, and to have the papers on the trial, so that they can be used, if the court shall then determine that they are competent and relevant evidence. * * When a party wants the production of a paper, document or book, he must specify it with as much particularity as is practicable ; he must state what it is ; he must make a *prima facie* showing that it is in the possession of the other party, and that it is material. * * The writ describes with sufficient particularity, indeed, with all the particularity that seemed to be practicable, under the circumstances, the very messages that are wanted." *U. S. v. Babcock*, 3 Dill. C. C. 566 ; *Barnes' case*, 5 Cong. Rec. 358, 477, 514, 602.

It would be a matter of utter impossibility to give a more definite description of the desired evidence than is contained in the subpœna. The investigations of a grand jury are *ex necessitate* secret, and heavy penalties are imposed upon all who give publicity to its proceedings. The object of this is obvious, and the rule is necessary to prevent the utter failure of justice in every instance. When an application is made for a subpœna *duces tecum*, that application goes upon the record and is open to the inspection of every one, and when a subpœna is issued and delivered to the sheriff, it is public, and there is no obligation upon either the officer who is charged with its service, or the witness upon whom it is served, to keep secret its contents. If, then, the petitioner's contention is successful, the circuit attorney and grand jury, in order to procure a subpœna

*duces tecum*, must not only state the names of the sender
and receiver of the telegram, and its date, but also its sub-
ject matter and its purport. When this is done, the secrets of
the grand jury room are made public,and the guilty parties,
whose crimes are being investigated, are very kindly noti-
fied to put themselves beyond the reach of the process of the
court.    See, also, *Morris v. Hannen*, 1 Carr. & Marsh. 29 ;
*Burnham v. Morrissey*, 14 Gray 226, 240 ; *Beam v. Link*, 27
Mo. 261.

4. The constitutional prohibition against unlawful
searches and seizures has no bearing on the case. The ob-
ject of that provision in the constitution of our State, and
others, is to prevent searches and seizures on warrants is-
sued without oath or information of any character. 15
Parl. Hist., 1394, 1419 ; *Barnes' case*, 5 Cong, Rec. 603, 604.

It is not attempted here either to search anything or
to seize any papers or person. All that is demanded is,
that in the interest of criminal justice, the witness shall
search for certain messages in his possession, which are
material to the inquiry then being had by the proper tri-
bunal, and to produce them before it. The object of the
writ in this instance being to afford aid in the administra-
tion of justice, in reference to acts and offenses in violation
of penal laws, it cannot be said to be within the constitu-
tional provision. *Robinson v. Richardson*, 13 Gray 454,
457. And even if this be in the nature of a search war-
rant, as is contended, does it not describe " the place to be
searched, and the person or thing to be seized, as nearly
as may be ? " It commands the witness himself to search
for the telegrams, and does not in any manner attempt to
lay hold of his private papers.

HENRY, J.—In the St. Louis criminal court, at the No-
vember term, 1879, a subpœna *duces tecum* was issued by
the clerk of said court, commanding the petitioner to ap-
pear before the grand jury on the 17th day of November,
1879, to testify in a certain matter pending before said

inquest, and then and there to produce any or all telegraphic dispatches, or messages, or copies of the same, then in the office of the Western Union Telegraph Company at St. Louis, Missouri, of which the petitioner was manager, described as follows :   Dispatches between Dr. J. C. Nidelet and A. B. Wakefield, and William Ladd and J. C. Nidelet, and William Ladd and Dr. Nidelet, between Warren McChesney and A. B. Wakefield, between Warren McChesney and J. C. Nidelet, between the latter and John S. Phelps, between A. B. Wakefield and John S. Phelps, between the latter and William Ladd, and between Geo. W. Anderson and A. B. Wakefield, sent or received by or between any or all of said parties, within fifteen months last past.   The petitioner appeared before the grand jury in obedience to the summons, and having been duly sworn, in answer to questions propounded, stated that he had in his custody such messages, or copies thereof, as were described in the subpœna, if there were any such in the office of the company, but declined to search for such telegrams and produce them, on the ground that he was but a servant of the company, and had no custody or control of any message or dispatch, except such as was given him by the company, which had forbidden, by its rules, managers and employees from furnishing copies of any original message or permitting such originals to be taken from the possession of the company, except by authority of one of its exexutive officers.   These facts were reported by the grand jury to the judge of the criminal court, and being brought before the court, the petitioner, persisting in his refusal, was committed for contempt and taken in custody by the sheriff of St. Louis county, whereupon he applied to this court for a writ of *habeas corpus*, and we are called upon to determine whether the commitment was legal or not.

Telegraphic messages are not privileged communications. *State v. Litchfield*, 58 Me. 267. No statute of this

Ex Parte Brown.

I. COMPULSORY
PRODUCTION OF
TELEGRAPHIC DIS-
PATCHES IN
COURT: liability
of company's
agent to punish-
ment for refusal.
State, or of the United States, has made them so. That mode of communication is of recent origin, and, therefore, the common law furnishes nothing but analogies for our guide. Telegraphic lines are not operated by the government, which is in no manner engaged in the business of transmitting telegraphic messages. It may enact laws in relation to them, as to other corporations, but has no business connection with them. On the other hand postal facilities were established by Congress; the mails are carried by the government through its own agents, and penal statutes protect communications sent through the mail. The entire postal system is under the control and management of the government. There is no statute of this State or principle of law which places a telegram on a different ground from that which any other communication occupies, made by one through another, to a third party, with respect to the liability of the confidant to be called as a witness to produce it or testify to it. There is no such analogy between the transmission of communications by mail, and their tranmission by telegraph, as would justify the application to the latter of the principles which obtain with respect to the former; and certainly penal statutes in relation to the one cannot by the courts be declared applicable to the other. The facts that railroad train orders are generally communicated by telegraph, that a vast amount of trade and traffic is transacted through this medium, that it has become of almost equal importance in the commerce of this country, with the postal system, and that in a business sense, men are compelled to transmit communications by the telegraph, are for the consideration of the legislative branch of the government in determining the propriety of placing telegraphic communications on the same footing with correspondence by mail, or declaring them privileged; but the annunciation of such a doctrine by the court would be an assumption of power which belongs to the legislative department.

"The right to resort to means to compel the production of written as well as oral testimony, seems essential to the very existence and constitution of a court of common law, which receives and acts upon both descriptions of evidence, and could not possibly proceed, with due effect, without them. And it is not possible to conceive that such courts should have immemorially continued to act on both, without great and notorious impediments having occurred, if they had been furnished with no better means of obtaining written evidence than what the immediate custody and possession of the party who was interested in the production of it, or the voluntary favor of those in whose custody the required instrument might happen to be, afforded." Lord Ellenborough in *Amey v. Long*, 9 East 473. This right of the court has not only been immemorially acted upon in England, but its exercise is of almost daily occurrence in this country.

The only ground, therefore, upon which the exemption of telegrams from this process of the court can be placed, is that they are privileged communications, and we cannot declare them to be such in the absence of a statute so providing. The transportation of packages and parcels by means of express lines, is becoming almost as great a necessity as that of sending communications by telegraph, and the two agencies are very frequently employed in intimate connection, and the argument which asserts the inviolability of telegrams, derived from a supposed analogy between the postal system and the telegraph, would as well apply to parcels or packages intrusted to the express company for transportation.

The rules of the company forbidding the petitioner from delivering telegrams or copies, afforded no legal excuse for his refusal to produce the telegrams. Telegraph companies, it is true, are by section 13, Wagner's Statutes, 325, subjected to a penalty for disclosing the contents of any private dispatch to any person other than the person to whom it is addressed, or his agent; but taken in con-

nection with section 51, page 507, it is obvious that it is not to be construed as prohibiting such disclosure when it is required as evidence in a judicial proceeding.   The latter section makes it a misdemeanor for any person connected with any telegraph line, willfully to disclose the contents, or the nature of the contents, of any message intrusted to him for transmission or delivery to any one to whom it is not addressed, except a court of justice, and in that exception we have a legislative recognition of the amenability of custodians of telegrams to a subpœna *duces tecum*, commanding their production.   It follows, if the court has the right to compel their production, that the company cannot, by any rules it may adopt, exonerate its agents from obedience to the judicial mandate.

The only remaining question is, whether the messages, the production of which was commanded by the process, were described with sufficient accuracy, to justify the court in compelling obedience to it.   The 23rd section of our bill of rights, declares:  " That the people ought to be secure in their persons, papers, houses and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, can issue without describing the place to be searched or the thing to be seized, as nearly as may be, nor without probable cause, supported by oath or affirmation."   We are not prepared to agree with the court of appeals that this section has " but little bearing upon the present question, except by way of argument and illustration;" but if it has no other bearing upon the question, the argument and illustrations drawn from it possess a cogency not to be despised.

2. ———: certainty of description of papers required in subpœna duces tecum.

The section declares that the people ought to be secure, in their papers, from unreasonable searches, and whether a subpœna *duces tecum* for papers, or search warrant for chattels, be issued, the spirit of that section demands that while in the latter case there must be probable cause, supported by oath or affirmation, with a description

in the warrant of the place to be searched, or the thing to be searched for, in the other, it shall at least give a reasonably accurate description of the paper wanted, either by its date, title, substance or the subject it relates to, and that it shall be shown to the court or authority issuing the process that there is a cause pending in a court and that the paper is material as evidence in the cause. To permit an indiscriminate search among all the papers in one's possession for no particular paper, but some paper, which may throw some light on some issue involved in the trial of some cause pending, would lead to consequences that can be contemplated only with horror, and such a process is not to be tolerated among a free people. A grand jury has a general inquisitorial power. They may ask a witness summoned before them, without reference to any particular offense which is a subject of inquiry, what he knows touching the violation of any section of the criminal code. Give such a body, in addition, the power to search any man's papers for evidence of some crime committed, and you convert it into a tribunal which would soon become as odious to American citizens as the Star Chamber was to Englishmen, or the Spanish Inquisition to the civilized world.

Here, communications, at different times within a period of fifteen months, sent or received by the parties named, are called for. The date, title, substance, or subject matter of none of them is given, and it is utterly impossible that it could have been made to appear, without more, that any of the messages were material as evidence before the grand jury. Moreover, it not only called for all messages between the parties named, but for all which may have been sent or received by either of the parties, to or from, any person on the face of the earth. A compliance with the order might have resulted in the production of confidential communications between husband and wife, client and attorney, confessor and penitent, parent and child. Matters which it deeply concerned the parties to

keep secret from the world, and of no importance or value as evidence in any cause, might thus be disclosed to the annoyance and shame of the only persons interested. Incidents in the lives of members of families which the happiness and welfare of the household require to be kept secret, might be exposed, and offenses not recognizable by the law, long since committed and condoned, brought to light and hawked through the country by scandal-mongers, to the disturbance of the peace of society and the destruction of the happiness of whole households. It is no answer to this that the obligation of secrecy imposed by law on grand juries would prevent such exposure. It is enough to disturb and harass a man, that twelve of his neighbors, though sworn to secrecy, have acquired knowledge diminishing their respect for him, which they had no right to obtain, and they may be the very twelve men with whom, above all others, he most desired to be in good repute. Such an inquisition, if tolerated, would destroy the usefulness of this most important and valuable mode of communication by subjecting to exposure the private affairs of persons intrusting telegraph companies with messages for transmission, to the prying curiosity of idle gossips, or the malice of malignant mischief-makers.

The power of a court of equity to compel a discovery by any party defendant to the suit, of any document in his possession, or fact resting in his knowledge, material to the issue on trial, bears an analogy to the subpœna *duces tecum*, and that power cannot be exercised to compel any discovery not material to the cause ; and on that subject, Lord Loughborough, in *Shaftsbury v. Arrowsmith*, 4 Ves. 66, said : " Permitting a general, sweeping survey into all the deeds of a family, must be attended with very great danger and mischief. It may set up a title, not for the benefit of the plaintiff, but to the injury of the devisees, indulging a speculation to the prejudice of parties whose interests this court has no right to invade." Mr. Fonblanque in his work on Equity, says : "A plaintiff by this bill, may, with-

out the least foundation, impute to the defendant the foulest frauds, or seek a discovery of transactions in which he has no real concern; and when the defendant has put in his answer, denying the frauds or disclosing transactions (the disclosure of which may materially prejudice his interests), the plaintiff may dismiss his bill with costs, satisfied with the mischief he may have occasioned by the publicity of his charge, or the advantage he may have obtained by an extorted disclosure." In reference to this abuse of the proceeding, he says: "The court alone can counteract it; and in vindication of its process, must feel the strongest inclination to interpose its authority." 2 Fonb. Eq. B. 6, ch. 8, § 1, note a. These observations are equally applicable to the subpœna *duces tecum*. The abuse of the power to compel a discovery is sedulously guarded against in equity jurisprudence, and yet ten-fold greater injury could be inflicted by means of a subpœna *duces tecum*, if it can compel a sweeping, indiscriminate production and inspection of the papers of any party to the suit, or witness in the trial. If our bill of rights had not guarded the citizen against such an abuse of a judicial process, we would be inclined to apply to this process the wholesome restrictions which equity jurisprudence has placed upon the power of a court of equity to compel a discovery.

The case of *Babcock v. The United States*, 3 Dill. 567, relied upon as an authority, as to the sufficiency of the identification of the telegrams, supports the view it is cited to sustain; but with the highest respect for the learning and ability of the judges who granted the order for the subpœna in that case, we cannot agree with them. Their opinion, delivered by Judge Dillon, is totally at variance with our convictions on the subject. An interesting article on the questions discussed in this opinion, read by Henry Hitchcock, Esq., of the St. Louis bar, before the American Bar Association, published in the Southern Law Review, No. 4, Vol. 5, (N. S.,) has been of great service to us in our investigations, and is a valuable contribu-

tion on the subject. In the dissenting opinion of Judge Lewis, of the court of appeals, in *Ex parte Brown*, the question on which he differed from his associates (the sufficiency of the identification of telegrams called for), is discussed with great ability and clearness. 7 Mo. App. 494; *s. c.*, 11 Cent. Law Jour. 115. All the forms of this subpoena to be found in works on practice, contain a particular description of the book, or paper or papers, the production of which is commanded, and this strengthens the position that a call for papers generally is insufficient. Our conclusion is, that the petitioner is entitled to his discharge from the custody in which he is held, and it is accordingly ordered that he be discharged. All concur.