## Ex Parte R. D. Gould.

### No. 954. Decided November 30, 1910.

**1.—Habeas Corpus—Contempt—Telegrams—Subpoena duces tecum.**

The Court of Criminal Appeals has power to grant writs of habeas corpus whenever a party is held without lawful authority; and this extends to a case of contempt of court without lawful authority of an agent of a telegraph company for not delivering telegrams on a subpoena duces tecum issued by a grand jury to produce said telegrams.

**2.—Same—Grand Jury—Power of—Confined to Subject under Investigation.**

The grand jury has great power, but this is not unlimited, and it can not be used out of idle curiosity for prying into the domestic and financial affairs of any person, and its investigation can not transcend beyond an inquiry into matters that are material to the subject under investigation.

**3.—Same—Contempt—Subpoena duces tecum—Telegrams not Privileged.**

It is clear that telegraphic messages in the possession of officers of the telegraph company are not privileged communications, and their production can be compelled as other writings under a subpoena duces tecum by the grand jury, if properly directed to discover crime; and no rule of the company can excuse an agent of the company from liability to punishment for refusal to properly respond to the summons.

**4.—Same—Rule Stated—Description of Telegram Necessary.**

Where a grand jury issues a subpoena duces tecum upon the agent of a telegraph company to produce before the grand jury telegrams in his possession, the subpoena should give a reasonably accurate description of the telegrams wanted, either by date, title, substance, or the subject to which they relate, as well as the names of the parties sending same.

**5.—Same—Bill of Rights—Protection of Papers against Seizures.**

The protection of papers is as much secured under the provisions of the Bill of Rights as a man's house against unlawful searches and seizures, and the. same rules that apply to one, apply to the other.

**6.—Same—Case Stated—Constitutional Law—Bill of Rights—Subpoena.**

A grand jury has no authority to issue a subpoena duces tecum commanding the agent of a telegraph company to appear instanter before said grand jury and produce before said grand jury all messages sent by the telegraph company at a certain station in this State ordering intoxicating liquors· to said station; unless it is made to appear that the disobedience to said subpoena is to some matter material to the investigation of crime before said grand jury, and unless the subpoena gives a reasonably accurate description of the telegrams wanted, and such sweeping subpoena would be violative of section 9, article 1 of the Constitution of Texas, known as the Bill of Rights. Following Boyd v. U. S., 116 U. S., 616, and other cases.

**7.—Same—Constitutional Interpretation—Function of Courts.**

The Constitution can not be enlarged, amended or repealed by interpretation, and whenever its provisions are violated either by executive or legislative officials, by the enforcement of rules and regulations violative of its provisions, the courts—anchored close to the Constitution—will never hesitate to call them back to the limits of that instrument.

From Callahan County.

Original habeas corpus proceeding asking release from punishment for contempt of court, for failing to respond to a subpoena duces tecum to produce before the grand jury all telegraphic messages sent by the telegraph company, etc.

The opinion states the case.

*N. L. Lindsley* and *E. G. Senter,* for relator, filed an able brief and cited cases in the opinion.

*John A. Mobley,* Assistant Attorney-General, for the State.

McCORD, JUDGE.—On the 12th day of November, 1910, this court granted a writ of habeas corpus to the relator commanding and directing Sheriff T. A. Irwin, of Callahan County, Texas, to appear before this court and show cause why he held relator, R. D. Gould, in custody. This writ was made returnable November 16, 1910. The return shows that the District Court, being in session in

the county of Callahan, and a grand jury being duly organized, that on the 9th day of November, 1910, said grand jury, through its foreman, issued a subpoena duces tecum for one J. W. Percy, commanding the said Percy to appear instanter before said grand jury and produce before said grand jury all telegraph messages sent by the Western Union Telegraph Company at Baird, Texas, ordering intoxicating liquors to Baird, Texas. Percy was the telegraph operator at the town of Baird. After said subpoena had been served upon him he notified the relator, R. D. Gould, of same, said Gould being his superior officer, and when notified thereof the said Gould, who resides at Dallas, Texas, immediately repaired to Baird, took charge of all the telegrams and refused to deliver them to the grand jury, and when he arrived at Baird, Texas, a subpoena duces tecum was also served upon him, commanding him to produce said telegrams before said grand jury; that in open court, having refused to produce said telegrams, he was held in contempt of court and ordered to be confined in the county jail of Callahan County, Texas, and to be kept in custody until he should produce said telegrams.

The State, through her Assistant Attorney-General, has moved to dismiss this writ on the ground that this court is without jurisdiction. This position is untenable. This court has power to grant writs of habeas corpus whenever a party is held without lawful authority. See Ex parte Park, 37 Texas Crim. Rep., 590; Ex parte Degener, 30 Texas Crim. Rep., 566. Under our system a grand jury has great power. Its proceedings are secret and its object is to ferret out crime, to discover the guilty party and indict all parties for the violation of the criminal laws of Texas. Its work is secret, and it is made a penal offense for the grand jury to disclose to the world the secrets of its body. Its power, however, is not unlimited and it can not be used as a place, out of idle curiosity, for prying into the domestic and financial affairs of any and everybody, but all of its inquiries must be directed to the discovery of crime, and it has power to pursue an investigation that may lead to the discovery of crime, but this investigation can not transcend beyond inquiry into matters that are material to the matter under investigation; and whenever it does so the courts are also open to redress to relieve a party from any undue oppression or investigation by them that is not relevant or pertinent to any matter about which they are investigating. The question here presented is, whether the grand jury had authority to issue a subpoena duces tecum so general and sweeping in its character as in this case. Article 428 of the Code of Criminal Procedure, provides: "The grand jury in propounding questions to a witness shall direct the examination to the person accused or suspected, shall state the offense with which he is charged, the county where the offense is said to have been committed, and, as nearly as may be, the time of the commission of the offense; but should the jury think it necessary, they may ask the witness in

general terms whether he has knowledge of the violation of any particular law by any person, and if so, by what person." Article 426 reads as follows: "When a witness, brought in any manner before a grand jury, refuses to testify, such facts shall be made known to the attorney representing the State or to the court, and the court may compel the witness to answer the question, if it appear to be a proper one, by imposing a fine not exceeding one hundred dollars and by committing the party to jail until he is willing to testify." Article 517 provides: "Before a fine is entered against a witness for disobedience to a subpoena, it must be made to appear to the court by the oath of the defendant or some other credible person, or the statement of the attorney representing the State, that the testimony of such witness is believed to be material, either to the prosecution or defense." From these articles of the Code we deduce that some crime, or some person must be suspected of a crime, and that the injury must be directed to a discovery either of the crime or the person; and, second, that the grand jury has power to interrogate the witness brought before them with regard to any crime that may have been committed of which the witness has knowledge, as well as the person who is suspected of committing the crime; and, third, the question propounded must be material to the particular matter under investigation, and that no court has power to punish for contempt for disobeying a subpoena unless it is made to appear that the disobedience and refusal to testify is as to some matter material to the prosecution, or some crime or person charged with the commission of a crime. The subpoena duces tecum issued in this case called upon Gould, the agent of the telegraph company, to have and produce instanter before the grand jury of said county all telegraphic messages of every character and description now in his possession or control, received from J. W. Percy, agent of the Western Union Telegraph Company, at Baird, Texas, or which were received from the office of said company at Baird, Texas. The messages referred to in the above subpoena duces tecum were those contained in the subpoena duces tecum served upon Percy, which required him, as agent of the Western Union Telegraph Company, at Baird, Texas, to produce before the grand jury of Callahan, Texas, now in session, all messages sent by parties from said Baird, Texas, ordering intoxicating liquors within the last six months. It will be noted that these subpoenas do call for messages within a specified time, but do not name the parties who sent the messages, and it was a very general, sweeping order. We think it is clear that telegraphic messages in the possession of officers of the company are not privileged communications and their production can be compelled as other writings. See Bank v. Bank, 7 W. Va., 544; Scott & Jarn. on Tel., sec. 378, note; U. S. v. Babcock, 3 Dill, C. C., 566; Ex parte Brown, 72 Mo., 83. The agent of a telegraph company may, therefore, be compelled by proper process to produce such message before

the grand jury, and no rule of the company can excuse him from liability to punishment for refusal so to do. This, however, is subject to the qualification that the subpoena must first have a certainty of description of papers required. The subpoena should give a reasonably accurate description of the papers wanted, either by date, title, substance or the subject to which they relate, as well as the names of the parties sending same. It is contended by relator that the subpoena in this case was unauthorized and violative of section 9, article 1, of the Constitution of Texas, known as the Bill of Rights, which reads as follows: "The people shall be secure in their persons, houses, papers and possessions from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation." It will be seen by reading this section that persons, houses and papers are put in the same class and the same restrictions and limitations apply to the one as the other, and the imperative demand of the Constitution is that no warrant shall issue without first describing them as near as may be; second, not then without probable cause supported by oath or affirmation. Section 29 of article 1 provides: "To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate. . . ." We are not advised that the question, as here presented, has ever been before the courts of Texas. The question, however, has received attention in sister States, where like constitutional provisions are in force and the same reasoning that applies to the search of the house will also apply to the seizure of papers, and it may be here stated that the Constitution of the United States embodies practically the same language upon this subject, the Fourth Amendment of the Constitution of the United States, reading as follows: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The case of Boyd v. U. S., 116 U. S., 616, involved a construction of this constitutional provision with regard to search and seizure. In 1874 Congress passed an Act which provided that in all suits other than criminal cases, arising under the revenue laws of the United States, the attorney representing the government, whenever in his belief any business book, invoice or paper belonging to or under the control of the defendant will tend to prove any allegation made by the United States, may make a written motion describing such book, invoice or paper, and set forth the allegations, which he expects to prove; and thereupon the court was authorized to issue notice to the defendant to produce such book, invoice or

paper, and if the defendant or claimant should refuse to produce such book, invoice or paper, that the allegations in such motion should be taken as confessed. The Supreme Court, in a very able opinion, reviewed this Act of Congress and held that it was violative of the Fourth and Fifth Amendments of the Constitution of the United States, which provided against unreasonable search and seizure, holding that a suit for penalties was quasi criminal. This opinion is quite lengthy and reviews this subject at some length, giving a history of the conditions that had existed in England during the days of the Star Chamber and of the causes which led the English people to make similar provisions in their Constitutions and which were brought forward and engrafted in the Constitution of the United States. The court says: "The practice had obtained in the Colonies, of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced 'the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book,' since they placed 'the liberty of every man in the hands of every petty officer.'" It seems that in 1761 Lord Halifax, who was then the Secretary of State for England, was in the habit of issuing warrants for searching private houses for the discovery and seizure of books and papers that might be used to convict their owner of certain crimes. This conduct on the part of the Secretary of State was resisted on the part of the people. Actions were brought by persons whose homes had been invaded and their papers seized, and in the case of Entick a suit was brought against Carrington, an under-officer of the Secretary of State, and which is reported in 19 Howell St. Tr., 1029. The allegation was there made that the defendant had broken into the dwelling-house of the plaintiff and broken open his desks, boxes and searching and examining his papers. This case was brought at the Michaelmas term, 1765, and Lord Camden pronounced the judgment of the court, and the law as expounded by him has been regarded as settled from that time to this, and his great judgment on that occasion is considered as one of the landmarks of English liberty. "It was welcomed and applauded by the lovers of liberty in the Colonies as well as in the mother country. It is regarded as one of the permanent monuments of the British Constitution and is quoted as such by the English authorities on that subject down to the present time. Our American statesmen, during our revolutionary and formative period as a nation, were undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law, and it evidently was in the minds of those who framed the Fourth Amendment to the Constitution, and was considered as sufficiently explanatory of what was meant by unreasonable searches and seizures." In that case Lord Camden said: "The

great end for which men entered into society was to secure their property. That right is preserved sacred and incommunicable in all instances where it has not been taken away or abridged by some public law for the good of the whole. The cases where this right of property is set aside by positive law are various. Distresses, executions, forfeitures, taxes, etc., are all of this description, wherein every man by common consent gives up that right for the sake of justice and the general good. By the laws of England every invasion of private property, be it ever so minute, is a trespass. No man can set his foot upon my ground without my license, but he is liable to an action though the damage be nothing. . . . Papers are the owner's goods and chattels; they are his dearest property, and are so far from enduring a seizure that they will hardly bear an inspection; and though the eye can not by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer, there is none, and, therefore, it is too much 'for us, without such authority, to pronounce a practice legal which would be subversive of all the comforts of society." And to the proposition contended for by the State, in this case, that this search was necessary to the detection of offenders by discovering evidence, we will answer this in the language of Lord Camden: "Lastly, it is urged as an argument of utility that such a search is a means of detecting offenders by discovering evidence. I wish some cases had been shown where the law forceth evidence out of the owner's custody by process. There is no process against papers in civil causes. It has been often tried but never prevailed. Nay, where the adversary has by force or fraud got possession of your own proper evidence there is no way to get it back but by action. In the criminal law such a proceeding was never heard of; and yet there are some crimes such, for instance, as murder, rape, robbery and house-breaking, to say nothing of forgery and perjury, that are more atrocious than libeling. But our law has provided no proper search in these cases to help forward the conviction. Whether this proceedeth from the gentleness of the law towards criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say. It is very certain that the law obligeth no man to accuse himself, because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it would seem that search for evidence is disallowed upon the same principle. Then, too, the innocent would be confounded with the guilty." The case of Ex parte Brown, 72 Mo., 83, was a case very much like the case at bar. In that case a subpoena duces tecum was issued by the clerk of the St. Louis Criminal Court, commanding the petitioner to appear before the

grand jury to testify in a certain matter pending before said inquest and then and there produce any or all telegraphic dispatches or copies of the same then in the office of the Western Union Telegraph Company at St. Louis, of which petitioner was manager, these dispatches being between certain parties therein mentioned. Brown appeared before the grand jury, but declined to produce the messages, and that court, invoking a provision of their Constitution similar to ours with regard to search and seizure, held that the party was not in contempt and that the District Court had no power to punish him for refusing to deliver the messages. Continuing, the opinion of the court says: "The section declares that the people ought to be secure, in their papers, from unreasonable searches, and whether a subpoena duces tecum for papers, or search warrant for chattels, be issued, the spirit of that section demands that while in the latter case there must be probable cause, supported by oath or affirmation, with a description in the warrant of the place to be searched, or the thing to be searched for, in the other, it shall at least give a reasonably accurate description of the paper wanted, either by its date, title, substance or the subject it relates to, and that it shall be shown to the court or authority issuing the process that there is a cause pending in a court and that the paper is material as evidence in the cause. To permit an indiscriminate search among all the papers in one's possession for no particular paper, but some paper, which may throw some light on some issue involved in the trial of some cause pending, would lead to consequences that can be contemplated only with horror, and such a process is not to be tolerated among a free people. A grand jury has a general inquisitorial power. They may ask a witness summoned before them, without reference to any particular offense which is a subject of inquiry, what he knows touching the violation of any section of the Criminal Code. Give such a body, in addition, the power to search any man's papers for evidence of some crime committed, and you convert it into a tribunal which would soon become as odious to American citizens as the Star Chamber was to Englishmen, or the Spanish Inquisition to the civilized world. Here communications at different times within a period of fifteen months, sent or received by the parties named, are called for. The date, title, substance or subject matter of none of them is given, and it is utterly impossible that it could have been made to appear, without more, that any of the messages were material as evidence before the grand jury. Moreover, it not only called for all messages between the parties named, but for all which may have been sent or received by either of the parties, to or from, any person on the face of the earth. A compliance with the order might have resulted in the production of confidential communications between husband and wife, client and attorney, confessor and penitent, parent and child. Matters which it deeply concerned the parties to keep secret from

the world, and of no importance or value as evidence in any cause, might thus be disclosed to the annoyance and shame of the only persons interested. Incidents in the lives of members of families, which the happiness and welfare of the household require to be kept secret, might be exposed, and offenses not recognizable by the law, long since committed and condoned, brought to light and hawked through the country by scandal-mongers, to the disturbance of the peace of society and the destruction of the happiness of whole households. It is no answer to this that the obligation of secrecy imposed by law on grand juries would prevent such exposure. It is enough to disturb and harass a man, that twelve of his neighbors, though sworn to secrecy, have acquired knowledge diminishing their respect for him, which they had no right to obtain, and they may be the very twelve men with whom, above all others, he most desired to be in good repute." To a certain extent the telegraph company is but the trustee of the sender of the message. It has by reason thereof in its possession important and valuable communications which should not be subject to exposure to the prying curiosity of idle gossips, or the malice of malignant mischief-makers. In the case of Bessemer City v. Eidge, reported in the 50 Southern Reporter, 270, the Supreme Court of Alabama held that an ordinance prohibiting the keeping of intoxicating liquor in any house, building or place where people resort, public or private, for lawful or unlawful purposes, and providing for the seizure and confiscation of such liquor and the arrest of any person suspected of violating the ordinance, with or without warrant, is in violation of the Bill of Rights declaring that the people should be secure in their persons, houses and possessions from unlawful search and seizure. Mr. Cooley, in his valuable work on Constitutional Limitations, page 424, says: "Near in importance to exemption from any arbitrary control of the person is that maxim of the common law which secures to the citizen immunity in his home against the prying eyes of the government, and protection in person, property and papers against even the process of the law, except in a few specified cases. The maxim that 'every man's house is his castle,' is made a part of our constitutional law in the clauses prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen." In the case of Carson v. Hawley, 84 N. W. Rep., 746, the Supreme Court of Minnesota held: A witness, in response to a subpoena, can not be required to produce all his books, papers and checks for a substantial period of time in response to an omnibus demand for the same in such subpoena, and a refusal to comply with such a demand does not furnish evidence that can be properly used against the party refusing to do so on the trial of an action, holding that this was violative of the provision of the Minnesota Constitution against search and seizures. In the case of Ex parte Frank Jaynes, reported in 70 Cal., 638, that court held: An employe of a telegraph com-

pany, having charge of messages transmitted by it, is not guilty of contempt for refusing to obey a subpoena duces tecum commanding him to search for and produce all messages from and to a large number of persons therein named, between specified dates. The subpoena must identify the particular messages required. In the case of Dupree v. State, 102 Texas Reports, 455, 119 S. W., 301, the Supreme Court of Texas held that the provisions of the Act of the Legislature authorizing searches of places and the seizure of liquors kept for sale in violation of law, are invalid for failing to require the complaint and warrant to describe the place to be searched, as required by the Bill of Rights, section 9, forbidding the issuance of any warrant to search any place without describing it. And the Supreme Court held further, that the purpose of section 9 with regard to unreasonable searches and seizure is to define and limit the power to invade the premises of the citizen by a specification of that which he may search for and seize, and that the provision of said Act is in violation of the Bill of Rights, section 9, because of the failure to require a description of the liquors to be seized, since all intoxicating liquors are not under the ban of the law, for they may be kept for lawful purposes, and since it is only where liquors are sold or kept for sale in violation of the law, they may be made subject to seizure. Further, the Supreme Court held that the Legislature can not dispense with the requirements of the Bill of Rights that search warrants shall not issue without probable cause, supported by oath, and it can not evade the limitation by an attempt to make that probable cause which is not such, and before a seizure can take place of such matters, the probable cause therefor must be supported by oath, and this oath can not be made upon belief, but it must be either upon personal knowledge of the facts, or must state the facts upon which he forms his belief.

In this case the subpoena duces tecum was for all telegrams sent from the office at Baird, ordering intoxicating liquors; it did not specify whether the liquors ordered were unlawfully sent for; it said all intoxicating liquors. All intoxicating liquors are not under the ban of the law. What right had the grand jury to have exposed before them the messages sent indiscriminately by the citizenship of Baird in ordering intoxicating liquors? The demand made upon the witness was unreasonable and unwarranted; it was too general: it did not relate to any crime committed, nor to any person accused or suspected; it was not directed to the inquiry into any crime; it failed to show the purposes for which the telegrams were demanded, and was but a prying and fishing expedition that can not be authorized by law. The protection of papers is as much secured under the provisions of the Bill of Rights as a man's house, and the same rules that apply to one apply to the other. The courts will not permit the exercise of an arbitrary power, where its tendency might be to disturb domestic relations, expose commercial secrets to satisfy the

idle curiosity of men. The Constitution holds too sacred the privacy of home to permit this. As was said by Lord Chatham: "The poorest man in his cottage may bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King may not enter, and all his forces dare not cross the threshold of the ruined tenement." We can not believe in the doctrine that Constitutions may be enlarged, amended or repealed by interpretation, and whenever the provisions of the Constitution are violated and officials, either ministerial, executive or legislative, attempt the enforcement of rules and regulations violative of its provisions, the courts, anchored close to the Constitution, have never hesitated to call them back to the limits of that instrument. Mr. Thompson on Trials, vol. 1, p. 589, gives this definition of a subpoena duces tecum: "A process by which a court, at the instance of a suitor, commands a person, who has in his possession or control some document or paper that is pertinent to the issues of the pending controversy, to produce it for use at the trial." And adds: "This writ extended no further than to compel the production of books and papers, the existence and character of which were already known to the party seeking to use them as evidence; so that, as already seen, it was necessary that it should describe the books or papers required to be produced, with a considerable degree of accuracy." On page 180, section 175, he says: "Particularity is required in describing the documents which the witness is required to produce. Thus, a subpoena to produce all the dispatches received at a certain telegraph office between the sixth and twentieth days of the month is too general. So, it has been held that a subpoena requiring a solicitor to produce all of his books, papers, etc., relating to all dealings between him and a party to the suit during a term of thirty-three years is too vague." It is useless to extend this inquiry further. Cases and instances could be multiplied showing that a subpoena of the character described herein is too general and that such a demand would be unreasonable. We are, therefore, clearly of opinion that the relator in this case was not required to obey the subpoena issued in this case, and for this reason the relator will be discharged.

*Relator discharged.*