# MACK CROWELL V. THE STATE.

No. 22765. Delivered April 12, 1944.
Rehearing Denied May 24, 1944.

The opinion states the case.

*C. M. Wilchar,* of El Paso, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

The conviction is for keeping a bawdy house, as prohibited by Art. 514, P. C. The punishment is the maximum, being a fine of $200.00 and confinement in jail for twenty days.

The sufficiency of the evidence to support the conviction is assailed.

The several terms embodied in the offense charged were, by the trial court, in his charge, defined as follows:

The term "bawdyhouse" was defined as "one kept for prostitution, or where prostitutes are permitted to resort or reside for the purpose of plying their vocation."

The term "prostitute" was defined as a "woman who, indiscriminately, consorts with men for hire."

The term "prostitution" was defined as "the act or practice of a woman, who, indiscriminately, permits men, for a price, to have sexual intercourse with her."

Thus appellant's guilt was, by trial court, made to depend upon facts showing that he kept a house where women indiscriminately permitted men to have sexual intercourse with them, for a price, or where women indiscriminately consorted with men for hire. In either instance, in order to constitute a bawdy house, the act of sexual intercourse on the part of the female was required to be for a price or for hire.

In determining the sufficiency of the evidence to support the conviction, such fact, that is, that the act or acts of sexual intercourse was or were required to be for hire, or for a price, must be borne in mind.

From the State's standpoint, the facts in this case are both revolting and shocking. We state only so much thereof as we deem necessary.

Appellant (a man 58 years of age) and his wife (a woman 44 years of age) resided in the little town of La Tuna, in El Paso County. Their residence was situated on a vacant or unfenced lot, about one hundred twenty-five feet from a public highway and about seventy-five feet from a cafe and bar operated by John Hall. Baltazar Olivas was an employee of Hall. Appellant and his wife had so resided for about a year and a half prior to April 10th, 1943. A Mrs. England also resided in the little town. Witnesses testified that both Mrs. England and appellant's wife bore the general reputation of being common prostitutes, and that such reputation, especially as to the wife, dated from the time that she and her husband first occupied the house. There was testimony that, for some time prior to the date mentioned, men of American, Mexican, and Negro descent were seen both day and night, going into and out of the house, and that Mrs. England, accompanied by men, was a daily visitor to the house.

The witness Olivas testified that, at about eleven o'clock on the night of April 10th, 1943, he passed by a window in the back or rear of appellant's house, and looked in, when he saw appellant's wife and a man by the name of Andrea engaged in an act of sexual intercourse. Appellant was in the room at the time, witnessing the act, and was seen searching through the pockets of Andrea's trousers. Olivas immediately returned to the cafe and bar. He told Hall and Mobley, a deputy sheriff, to "Come here, I want to show you something." Hall, Mobley, and Ward (an immigration officer) went with Olivas to the window, where they saw what Olivas had seen. Thereupon, Mobley, accompanied by Olivas, went into the house and placed all parties

under arrest. Appellant's wife was subsequently charged with, and, upon her plea of guilty, was convicted of, the offense of vagrancy, because she was a common prostitute. The accusation here involved was filed against appellant. The record does not reflect that Andrea was charged with any offense.

No objection was made to the proof of the fact that appellant's wife had pleaded guilty to being a common prostitute and had been judicially determined to be such a person; but, to the contrary, appellant first went into this matter upon cross-examination of the witness Mobley.

It is true, as asserted by appellant, that mere proof that a house has the reputation of being a house of prostitution is insufficient to show that it is such in fact, or that mere proof that a woman has the reputation of being a prostitute is insufficient to show that she is such in fact. Gibson v. State, 144 Tex. Cr. R. 263, 162 S. W. (2d) 703. But here, the facts go further, and show not only that the woman had the reputation of being a prostitute, but that, upon her plea of guilty, she had been judicially determined so to be; and, in addition, the proof shows an act of sexual intercourse, by that prostitute, with a male person, in the appellant's house.

The facts are, therefore, sufficient to support the conviction, and appellant's contrary contention is overruled.

Appellant objected to the testimony of Olivas, Mobley, and Hall as to what each saw while looking through the window of the house. The objection to this testimony was that it constituted, and was obtained as a result of, an illegal search of his residence, and was obtained in violation not only of the Constitutional guarantee against unreasonable search and seizure (Art. I, Sec. 9, State Constitution, and 4th Amendment to Federal Constitution), but also as a result of a violation of law, in that said witnesses were trespassers upon appellant's premises at the time. (Art. 727a, C. C. P.).

The provisions of the Constitutions mentioned guarantee one protection against unreasonable searches and seizures of his private residence; and, if the act of the parties mentioned in going to and looking through the window of the house constituted an unreasonable search of the house, then the testimony was illegally obtained; or, if, in going to and looking into and through the window, said parties violated any law, then their testimony as to what they saw occurring within the house would be inadmissible. If not, then the testimony was admissible.

We do not here have the question of whether or not the search, if any ,of appellant's residence was reasonable. If the act of the officer in looking through the window and thereby discovering the facts to which he testified constituted a search of the residence, same was unreasonable, because it was not made as a result of a search warrant or was not made in connection with a lawful arrest or in connection with a felony. Therefore, the question is solely whether the evidence was obtained as a result of a search of the residence.

A "search," within the contemplation of the search and seizure laws, means, of necessity, a quest for, a looking for, or a seeking out of, that which offends against the law. It implies a prying into hidden places for that which is concealed. It is not a search to observe that which is open to view. People v. Smith, 43 N. E. (2d) 420, 315 Ill. App. 671; 38 Words and Phrases, Permanent Edition, Page 401.

In the instant case, the particular plot of ground upon which appellant's residence was situated was not fenced, nor was it otherwise segregated, so as to show what constituted the residential premises or "curtilage." While it is true that the bill of exception presenting this question certifies that the witnesses went "around the South end of defendant's house, or home, in his back yard, close to the back window of said house," yet there is an absence of any testimony suggesting that, when Olivas first looked through the window, or when Hall and Mobley looked into the house through the window, they were seeking out, or were in quest of, any particular thing or information, because Olivas, in reporting to Hall and to Mobley, only stated to them: "Come here, I want to show you something." Moreover, what the witnesses saw transpiring in the house was entirely open to their view. It was not hidden, and no peeping or prying on their part was necessary to see what they did see.

The constitutional guarantee against unreasonable searches and seizures is designed to protect the private ,security and sanctity of one's home, and to prevent unlawful invasion thereof, It is not a haven behind which one may seek refuge against prosecution for violations of the law committed in his home, the evidence and knowledge of which he himself makes no effort to conceal, but permits to be done in the view of the passers-by.

Art. I, Sec. 9, of the Constitution of this State, and the 4th Amendment to the Federal Constitution are, in all material aspects, the same.

In Hester v. United States, 265 U. S. 57, 68 L. Ed. 898, 44 Sup. Ct. Rep. 445, the Supreme Court of the United States held that the testimony of two officers of the law who trespassed upon the accused's land, concealed themselves one hundred yards away from his house, and saw him come out and hand a bottle of whisky to another, was not inadmissible as having been obtained in violation of the 4th Amendment, because, even though the officers were trespassers, there was no search of the person, house, papers, or effects.

In the celebrated wire-tapping case of Olmstead v. United States, 277 U. S. 438, 72 L. Ed. 944, 48 Sup. Ct. Rep. 564, 66 A. L. R. 376, the Supreme Court of the United States, in holding that evidence obtained as a result of a tapping of telephone wires was not a search, and was not a violation of the 4th Amendment, and after reviewing at length the opinions of that court touching the question of search and seizure, said:

"Neither the cases we have cited nor any of the many Federal decisions brought to our attention hold the 4th Amendment to have been violated as against a defendant unless there has been an official search and seizure of his person or such a seizure of his papers or his tangible material effects or an actual physical invasion of his house 'or curtilage' for the purpose of making a seizure."

Again, in Goldman v. United States, 316 U. S. 129, 86 L. Ed. 1322, 62 Sup. Ct. Rep. 993, the Supreme Court of the United States, in holding admissible evidence obtained as a result of the use of a detectaphone placed in an office adjoining that of the accused, reaffirmed the holding above mentioned.

Under the authorities mentioned, we have to show a search of the residence or that appellant's rights under the 4th Amendment to the Federal Constitution were violated. The evidence admitted was not obtained in violation thereof.

As sustaining the same conclusion under Art. I, Sec. 9 of our State Constitution, attention is called to the following cases: Stach v. State, 97 Tex. Cr. R. 280, 260 S. W. 569; Eversole v. State, 106 Tex. Cr. R. 567, 294 S. W. 210; Hunter v. State, 111 Tex. Cr. R. 252, 12 S. W. (2d) 566; and Taylor v. State, 120 Tex. Cr. R. 268, 49 S. W. (2d) 459.

Appellant, in support of his contention, relies upon the case of Gonzales v. State, 131. Tex. Cr. R. 15; 95 S. W. (2d) 972. In that case, the search of the home of the accused was by virtue of an illegal search warrant, and the reversal of the judgment of conviction was based upon that fact. What we there said relative to the previous visits by the officers to the home of the accused and their smelling for the odor of marihuana as being a trespass by the officers, and upon which language the appellant here relies, was not the basis for the reversal of the case.

We conclude that, in the instant case, the evidence as to what the officers saw transpiring in appellant's home was not obtained as a result of any search thereof, and was not, therefore, in violation of the State or Federal Constitutional guarantees.

Appellant next contends that such testimony was inadmissible under Art. 727a, C. C. P., which prohibits the use of evidence obtained by an officer or other person, in violation of the laws of this State, because, at the time the witnesses saw what was transpiring in the house, they were trespassers.

Whether the parties were guilty of a civil trespass is beside the question and is immaterial, because the statute mentioned has application to the violation of laws of this State, and there is no statute making it an offense merely to go upon the premises or property of another. Hence the facts fail to show that the parties were guilty of a criminal trespass merely because they were on the appellant's premises, or that, in so doing, they violated any statute. The provision of Art. 727a, C. C. P., relied upon is, therefore, neither applicable nor controlling here.

The other bills of exception appearing have been examined and are overruled without discussion.

The judgment of the trial court is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

GRAVES, Judge:

Appellant complains because of the failure in the original opinion herein to discuss some of his bills of exceptions which

were not noticed in detail therein, one of such complaints being because deputy sheriff Mobley was allowed to testify that "the citizens of Anthony came to me, as a peace officer, and said they wanted something done about it; they didn't like what was going on up there and there were a lot of citizens that were pretty well riled up about the thing." This testimony was given under the following circumstances: The officer was asked on cross-examination by appellant's attorney if he, the officer, had not told such attorney, soon after appellant's arrest, that: "Yes, I stated to you (defendant's counsel) in that conversation out there at the hospital that Mr. Crowell was a pretty good old man and that I felt sorry for him, but I also stated that I wanted to run him out of Anthony." Whereupon on redirect examination, upon the part of the State, he was allowed to explain why he wanted to run appellant out of the town of Anthony.

This witness, a deputy sheriff, had given testimony for the State that was damaging to appellant's defense, and in order to show unfriendliness towards appellant the attorney had inquired of the officer if he had not made the statement relative to running appellant out of town. This was done in order to show ill will and bias upon the part of the witness, as well as an effort to impeach his testimony and discredit him before the jury. It will be noted, however, that this conversation was first gone into by appellant's attorney upon the officer's cross-examination, and evidently was an attempt to impeach or at least to reflect on the witness and his testimony; he then had the privilege of showing why he desired to get appellant out of town. See Branch's Penal Code, Sec. 94, p. 60. Again, Mr. Branch says, p. 62, idem:

"Whatever material facts are introduced that tend to affect the issue, the other side has the right to deny, contradict or explain that testimony, showing its falsity, or breaking its force and effect in any legitimate way," citing a long list of cases.

In the case of Venn v. State, 78 Tex. Cr. R. 545, 182 S. W. 315, while one Weaver, a State's witness, was on the stand, he was asked on cross-examination if he did not run off and forfeit his attachment bond in a district court case growing out of some cases "turned in by him" before the grand jury, whereupon the county attorney asked this question: "Why did you run off and forfeit your attachment bond as a witness?" and he answered: "Because I was afraid of some characters I was dealing with." In that case we said:

"Under the decisions it seems that this testimony, having been brought out by the defendant, or the fact, rather, that he ran away and forfeited his attachment bond in regard to a District Court case, would justify the county attorney in inquiring into the reasons why he forfeithed such attachment bond. It seems it did not apply to this case, but the defendant elicited the fact that witness had forfeited his attachment bond. We are under the impression that under such circumstances the county attorney would be entitled to prove by him why he forfeited the bond. The matter had nothing to do with this case in any way, but inasmuch as the defendant brought out the matter, it became the subject of cross-examination by the State."

We think this matter is governed by Art. 728, C. C. P., especially the latter part thereof wherein it is said:

"When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence."

It is true that this testimony consisted of hearsay, but not all hearsay testimony is inadmissible, as witness that which is here legitimately present relative to the reputation of Adeline Crowell as well as that of Mrs. England, as well as their conduct with the presence of men going into and coming from this house at all hours. Under the cross-examination of the State's witnesses as to the reputation of these women, it became evident therefrom that there was a considerable amount of talk in the neighborhood relative to what occurred both in the daytime and the nighttime at this house and with these women. We think the testimony complained of is found in substance in the testimony of the character witnesses to such an extent that it informed the jury of nothing new or different from what had already been admitted without objection, much of such testimony being brought out on cross-examination of State's witnesses.

Appellant also complains again relative to certain remarks of the county attorney when he was arguing to the jury that "ex-deputy sheriff Mobley had complaints from the preacher and others against defendant, and that this was stated by Mobley in reply to a direct question asked him by defendant's counsel," appellant's objection thereto being that "No such question had been asked said witness by defendant's counsel." This ground of the objection seems to be true, appellant's counsel

having merely laid the matter open for an explanation upon the part of the officer. In any event we held above that the statement itself was admissible under these circumstances, and we think that as to this argument it was immaterial therein as to who asked such question, the testimony being properly before the jury.

On account of the insistence of appellant's attorney we have discussed the matters raised by appellant in this motion, and which were not written on in the original opinion.

We adhere to the views as expressed in the original opinion, and overrule the motion for a rehearing.