**Clifford James BROWN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 65431.**

Court of Criminal Appeals of Texas,
En Banc.

Sept. 14, 1983.

Allan K. Butcher, J. Don Carter, Fort Worth, for appellant.

Tim Curry, Dist. Atty., C. Chris Marshall, William Kane, John Bankston, George Mackey and James J. Heinemann, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION ON REMAND FROM THE UNITED STATES SUPREME COURT

McCORMICK, Judge.

This Court's original opinion and judgment, *Brown v. State*, 617 S.W.2d 196 (Tex. Cr.App.1981), were reversed by the Supreme Court of the United States, *Texas v. Brown*, —— U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), and the case was remanded for further proceedings.

Appellant now raises two questions and asks that they be resolved:

1. Did this Court rely on the United States Constitution in its decision, or did it look to Article I, Section 9 of the Texas Constitution?

2. If the Court did in fact base its decision on the Fourth Amendment to the Federal Constitution, does the Texas Constitution nevertheless provide an independent basis that would support the Court's conclusion?

In response to appellant's first inquiry, and as noted by the United States Supreme Court, our original opinion rested squarely on the interpretation of the Fourth Amendment in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and Texas cases interpreting that decision, e.g., *Howard v. State*, 599 S.W.2d 597 (Tex.Cr.App.1979); *DeLao v. State*, 550 S.W.2d 289 (Tex.Cr.App.1977); *Duncan v. State*, 549 S.W.2d 730 (Tex.Cr.App.1977); and *Nicholas v. State*, 502 S.W.2d 169 (Tex. Cr.App.1973). *Texas v. Brown*, —— U.S. ——, 103 S.Ct. 1535, 1537–1538, footnote 1, 75 L.Ed.2d 502.

We also answer appellant's second inquiry in the negative, and decline his invitation to attach to Article I, Section 9 of our Texas Constitution a more restrictive standard of protection than that provided by the Fourth Amendment.

The case of *Crowell v. State,* 147 Tex. Cr.R. 299, 180 S.W.2d 343 (1944), appears to be dispositive of appellant's inquiry. There the accused claimed that certain persons had violated his rights by looking into the open window of his house from their vantage point outside. The accused said this violated either the Fourth Amendment or Article I, Section 9 of the Texas Constitution, and that it also violated the laws concerning trespass, thereby rendering the evidence inadmissible in light of Article 727a (now Article 38.23) of the 1925 Code of Criminal Procedure. In discussing the defendant's contentions, this Court said:

"The constitutional guarantee against unreasonable searches and seizures is designed to protect the private security and sanctity of one's home, and to prevent unlawful invasion thereof. It is not a haven behind which one may seek refuge against prosecutions for violations of the law committed in his home, the evidence and knowledge of which he himself makes no effort to conceal, but permits to be done in the view of the passers-by.

"Art. I, Sec. 9, of the Constitution of this State, and the 4th Amendment of the Federal Constitution are, in all material aspects, the same." 180 S.W.2d at 346.

█ We recognize that the states are free to accept or reject federal holdings and to set for themselves such standards as they deem appropriate so long as the state action does not fall below the minimum standards provided by the federal constitutional protections. See *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). We likewise recognize that the State of Texas has, in the past, established stricter, more protective provisions, such as providing for a statutory exclusionary rule (see Article 38.23, supra, and its predecessor) well in advance of the 1961 Supreme Court decision in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

But it is not the function of the judiciary to engraft such changes upon our Constitution. That function lies with the people of the State of Texas through the constitutional amendment process, and through the Legislature which has the duty and ability to make statutory change in our procedure. Since this Court's pronouncements in *Crowell v. State,* supra, almost forty years ago, there has been no groundswell to change the provisions of Article I, Section 9. And since that time, this Court has opted to interpret our Constitution in harmony with the Supreme Court's opinions interpreting the Fourth Amendment. We shall continue on this path until such time as we are statutorily or constitutionally mandated to do otherwise.

The judgment of the trial court is affirmed.

ODOM, J., concurs in the result.

CLINTON, Judge, concurring.

The answer given to the first question is correct.[1] To the second question posed by appellant the plurality quickly, broadly and irrationally responds with an erroneous answer. While it may be that the Texas Constitution does not provide "an *independent basis* that would support the Court's conclusion" on original submission,[2] see, e.g., *Rochelle v. State,* 107 Tex.Cr.R. 79, 294 S.W. 860, 863 (1927) (Opinion on Rehearing), still we ought not gratuitously to say that the reason there is not "an independent basis" is because we have[3] and "shall

1. What was questioned in *Brown v. State,* 617 S.W.2d 196 (Tex.Cr.App.1981) was "the sole argument advanced by the State that the green balloon seized was in 'plain view' incident to a lawful arrest," *id.,* at 200. In finding that it was not we opined that the "immediately apparent aspect is central to the plain view exception and is here relied on by appellant," *ibid.* Little did we anticipate that a majority of the Supreme Court would come to regard its phrase "immediately apparent" to be such "an unhappy choice of words," *Texas v. Brown,*

—— U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), that a different aspect must be substituted for it.

2. All emphasis is added throughout by the writer of this opinion unless otherwise indicated.

3. As shall be demonstrated, most untenable is validity of the proposition that since the "pronouncements in *Crowell v. State,* supra ... this Court has *opted* to interpret our Constitution in

continue" to interpret our Constitution "in harmony" with constructions placed on the Fourth Amendment by the Supreme Court of the United States, and thereby deprive the citizens of this State of protections against invasion of privacy reasonably flowing from Article I, § 9, and other guarantees in our own Bill of Rights. Such is a dangerous abdication of judicial duties and responsibilities as Judges of this Court.

The Commissioner's Decision written by Judge Davidson in *Crowell v. State,* 147 Tex.Cr.R. 299, 180 S.W.2d 343 (1944), the opinion being approved by the Court, does indeed set forth the two paragraphs excerpted by the plurality in the cause at bar. However, a close reading of the opinion will reveal that they are but preliminary, introductory statements that do not constitute a holding.[4] Rather, the opinion proceeds to examine separately decisions of the Supreme Court pertaining to application of the Fourth Amendment to a variety of situations [5] and several opinions of the Court under Article I, § 9 of the Constitution of Texas treating "open" or "plain" view incidents.[6] The holding is:

"We conclude that, *in the instant case,* the evidence as to what the officer saw transpiring in appellant's home *was not obtained as a result of a search* thereof, and *was not,* therefore, *in violation* of the State or Federal Constitutional guarantees." *Id.,* 180 S.W.2d, at 347.

This is a far cry from a finding that "this Court has opted to interpret *our* Constitution in harmony with the Supreme Court's opinions interpreting the Fourth Amendment."

We were informed during oral argument that *Crowell* has not again been cited as

authority for the proposition now grasped by the plurality. And a recognized scholar in the field reported as late as February 1981 that this Court has never "*indicated* that it will interpret article I, section 9 to mean only what the fourth amendment means," Dawson, *State-Created Exclusionary Rules in Search and Seizure: A Study of the Texas Experience,* 59 Tex.L.Rev. 191, 215. Professor Dawson explained:

"The closest the court has come to taking a position on this question is its *observation* in Crowell v. State, [supra], that '(article) I, (section) 9, of the Constitution of this State, and the 4th Amendment to the Federal Constitution are, in all material aspects, the same.'"

An "observation" is surely the slenderest of reeds for a plurality to cling to. There are clearer perspectives: One is historical; the other implicates consideration of public policy.

The Constitution of The Republic of Texas contained a Declaration of Rights and mandated that they "shall never be violated on any pretence whatever." The Fifth declaration is:

"The people shall be secure in their persons, houses, papers, and possessions, from all unreasonable searches and seizures, and no warrant shall issue to search any place or seize any person or thing, without describing the place to be searched or the person or thing to be seized, without probable cause, supported by oath or affirmation."

With slight modifications in grammatical structure from time to time, that protection against invasion of privacy has remained essentially the same. See Article I, § 9, Bill of Rights, Constitution of the State of

---

harmony with ... Fourth Amendment" interpretations by the Supreme Court.

4. The question presented by the facts was "solely whether the evidence was obtained as a result of a search of the residence," *Crowell v. State,* 180 S.W.2d at 346.

5. They are the "open field" doctrine of *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); the now discredited wiretapping case of *Olmstead v. United States,* 277

U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376 (1928) and use of detectaphone in *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942).

6. Though opinions have rarely noted it, there is a legal distinction between a justified seizure under the "plain view" doctrine and a simple observation of material that is in "open view." See *Texas v. Brown,* —— U.S. at ——, 103 S.Ct. at 1541, n. 4.

Texas of 1876. While its origin may indeed be traced back to incidents in English and American colonial history, Interpretive Commentary, 1 Vernon's Texas Constitution 251, surely local experiences at the hands of "military commandants," alluded to in the Declaration of Independence of the Republic,[7] made constitutional protections even more imperative, and that the safeguards they provided be enforced.[8]

Early on, if not delineated by their own precedents, out of necessity young Texas courts looked to the common law or took the law from any other reasonably acceptable source. See, e.g., *Bush v. The Republic of Texas*, 1 Tex. 455 (1846). There is a paucity of opinions delving into criminal law and procedure—much less search and seizure law. See White's Criminal Procedure Annotated (1900) 13–14, Article 5; 1 Paschal's Digest of Decisions (1872) 720–723, §§ 8577–8607. Not until 1876 did the Supreme Court of Texas define "probable cause," and that was in a civil suit for slander, malicious prosecution and duress, *Landa v. Obert*, 45 Tex. 539 (1876). But the methodology is illustrative, for the court settled on that which had been found by the Supreme Court of Minnesota in *Cole v. Curtis*, 16 Minn. 182, 195. *Landa v. Obert*, supra, at 544.

In turn, the definition approved by the Minnesota court was taken from its stated source: *Munn v. dupont de Nemours*, 3 Wash. C.C. 31,[9] 4 Hall.Law J. 102, 1 Am. Lead.Cas. 200, 17 Fed.Ca. 993 [10] (Case No. 9,926, Circuit Court, D. Pennsylvania, May 1811). This action originated in a Pennsylvania state court, but was removed to federal circuit court on petition of de Nemours

et al. See *Munn v. de Nemours*, 2 Wash. C.C. 463, 17 Fed.Cas. 999 (Case No. 9,931, Circuit Court, D. Pennsylvania, April Term, 1810). It is a suit for malicious prosecution. What is reported is the charge given the jury by Justice Washington, and therein appears a definition of probable cause, *viz:*

> "What then is the meaning of the term 'probable cause?' We answer, a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief, that the person accused is guilty of the offense with which he is charged." *Id.*, Fed.Cas. at 995.

Many federal and state decisions that later noticed Justice Washington's definition of probable cause are listed in headnote 4. One is *Boyd v. Mendenhall*, 53 Minn. 274, 55 N.W. 45 (1893), adverting to its own earlier opinion in *Cole v. Curtis*, supra, which, it will be recalled, had cited *Munn v. de Nemours*, supra.[11]

Thus, when the Supreme Court of Texas imported a definition of probable cause from a sister state to apply in the malicious prosecution part of the cause being decided in *Landa v. Obert*, supra, that it had originated in a federal trial court did not mean the Supreme Court had "opted" to follow an expression of federal law, but only the Supreme Court looked around and found elsewhere what it deemed to be a reasonably acceptable definition, having none of its own making at the time. It and other courts in this State would continue that methodology.

As already indicated, circumstances of the times and strongly held popular senti-

---

7. In full that grievance charged that the government had

   "suffered the military commandants, stationed among us, to exercise arbitrary acts of oppression and tyranny, thus trampling upon the most sacred rights of the citizen, and rendering the military superior to the civil power."

8. For good measure when it came to enact a complete code of criminal procedure, the Legislature incorporated virtually verbatim the constitutional language, Article 5, O.C. 1856. It is now Article 1.06, V.A.C.C.P.

9. Apparently this is the first publication from manuscripts of Bushrod Washington, Associate Justice of the Supreme Court of the United States, done under the supervision of Richard Peters, Jr., Esq. See 17 Fed.Cas. 993, n. 1.

10. While none is easily available, the writer finally found the report in the Federal Cases series of collations by West Publishing Co.

11. The Minnesota court called it *Munns v. Dupont,* but gave a correct citation and specifically mentioned Justice Washington.

ments influence constitutions, statutes and, yes, courts in developing the law. In Texas the prohibition movement came to have a significant impact on our law of search and seizure,[12] and to those developments I now turn.

Prohibition forces were successful in having the convention include in the Constitution of 1876 a local option provision, Article XVI, § 20. See Interpretive Commentary following § 20. After implementing legislation had been enacted, areas of "prohibition territory" were created pursuant to local option laws. In time, however, being given to understand that "the will of the people is [being] thwarted and the local option laws of this state are ... made ineffective," the Legislature acted to eradicate what the Court characterized as a "crying [public] evil," *Hughes v. State,* 67 Tex. Cr.R. 333, 149 S.W. 173, 180[13] (1912). Excessive measures to the same end were commonplace, and Judge Roberts identified many of them in *Gillett v. State,* 588 S.W.2d 361, 368 (Tex.Cr.App.1979) (Dissenting Opinion). Resisting legislative enactments, some citizens soon found themselves in a courtroom litigating validity of one or another statute. They invoked, *inter alia,* Article I, § 9.

Initially the Supreme Court of Texas held unconstitutional an act authorizing the issuance of warrants to search places wherein intoxicating liquors were kept for sale in violation of law and to seize and confiscate the liquors. *Dupree v. State,* 102 Tex. 455, 119 S.W. 301 (1909). The Supreme Court took guidance from many sources, including the Supreme Court of the United States, which construed similar constitutional provisions, as well as the Fourth Amendment. *Id.* 119 S.W. at 304–305.

Soon the Court was confronted with the problem of a Western Union agent who had been held in contempt for refusing to produce before a grand jury telegraphic messages ordering intoxicating liquors to Baird. *Ex parte Gould,* 60 Tex.Cr.R. 442, 132 S.W. 364 (1910). Noting that the question had never been presented before the courts of Texas, the Court pointed out that it had, however, "received attention in sister states ... where like constitutional provisions are in force ... and that the Constitution of the United States embodies practically the same language upon this subject, the fourth amendment...," *id.* 132 S.W., at 366. Accordingly, *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886)—"a very able opinion"—was examined at length, as were opinions from other states, along with *Dupree v. State,* supra. The Court concluded that Gould was not required to obey the subpoena, and ordered his discharge.

Prohibitionists coupled more personal efforts with their legislative program.[14] They formed local chapters of the "Law and Order League" whose members pledged "to do all in my power" to "secure convictions in all cases wherein persons are charged with violating the law, especially the local option law," naturally including serving on juries. See *Counts v. State,* 78 Tex.Cr.R. 410, 181 S.W. 723, 725 (1916) and *Deadweyler v. State,* 57 Tex.Cr.R. 63, 121 S.W. 863, 865 (1909). That some joined peace officers in searching for and seizing intoxicating liquor is demonstrated by opinions of the Court cited by Judge Roberts in *Gillett v. State,* supra, at 368.

Which brings us to Rudolph Welchek driving down a roadway in Brazoria County on April 22, 1921. After waiting for and watching him drive by, the Sheriff, "accom-

---

**12.** Bubany and Cockerell, *Excluding Criminal Evidence Texas-Style: Can Private Searches Poison the Fruit,* 12 Texas Tech Law Review 611, 615, n. 22: "The problems in Texas concerning search and seizure are a product of the era of 'noble experiment'..."

**13.** Inveighing against express companies and their agents, Judge Pendergast charged that they were defying and nullifying state prohibi-

tion laws "to such an extent as to become a stench in the nostrils of all law-abiding and order-loving citizens, whether they were in favor of or against prohibition."

**14.** Among others, Acts 1919, 36th Leg., 2nd C.S., p. 228, ch. 78, the "State-Wide Intoxicating Liquor Prohibition Law."

panied by a number of other gentlemen," stopped Welchek, conducted a warrantless search of his automobile and seized three one gallon jugs of whiskey. *Welchek v. State,* 93 Tex.Cr.R. 271, 247 S.W. 524 (1923) —a unanimous opinion written by Judge Lattimore for the Court composed of Presiding Judge Morrow, Judge Hawkins and himself.

Presaging importance of the remarkable opinion about to be given, Judge Lattimore noted:

> "The question of search and seizure is now being raised in nearly all liquor cases tried in this state if the facts at all justify the defense in interposing objections relating to such question. Said question is squarely raised in the instant case." [15]

Then he crafted the framework of the opinion:

> "In determining the issues thus raised we decline to be drawn into a discussion of any federal authorities cited in behalf of the appellant, or into any criticism of same unless the question before us is in some way a federal question, and therefore subject to review at the hands of the Supreme Court of the United States, or unless the authorities cited be directly pertinent to the questions involved and be antagonistic to our own views."

With that understanding the Court quickly dismissed *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), *Weeks v. New York,* supra, and *Gouled v. United States,* supra, cited *ante* in note 14, in that there is no "analogy of principle existing between the law governing the taking of private papers, the undeniable property of the owner, and the law governing a case in which the article seized is intoxicating liquor in which no property right inures under the express laws of this state," 247 S.W. at 526.

*Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921) proved to be more troublesome, however, since it *did* involve a warrantless seizure of liquor. The Court first pointed out that *Amos* "advances no reasons applicable to a prosecution under our state laws and procedure," but conceding that "the subject matter ... is similar," Judge Lattimore wrote for the Court:

> "[W]e respectfully state that we think the opinion in said case rests upon a misapprehension of the purpose of the federal Constitution, which is substantially the same as section 9, art. 1, of our state Constitution, and that the learned court was not justified in applying to the decision of the facts before it in the Amos Case, supra, the principles announced in the Weeks and Boyd Cases, supra. This court can in no event follow such an extension of the principle involved in said cases as appears in the attempted application thereof in the *Amos* Case, supra."

Then the Court examined *Adams v. New York,* 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575 (1904) against *Weeks v. New York,* supra, opined that "the reasoning and conclusion reached by the court in the *Adams* Case appeal more to our judgment than that announced in the Weeks Case later," and concluded:

> "We entertain the most profound respect for the opinions of the Supreme Court of the United States, and feel ourselves obligated to follow them in all cases involving any federal question, and also in all other cases where their judgment is at all compatible with our own judgment as to what disposition should be made of questions arising under our state laws and procedure."

*Welchek,* supra, 247 S.W. at 528. *Weeks* was found incompatible:

> "We believe that nothing in section 9, art. 1 of our Constitution, supra, can be invoked to prevent the use of testimony

**15.** Patently counsel for Welchek had read *Weeks v. New York,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), for he raised the question by pretrial motion that the liquor be returned to his client

and that testimony by officers as to finding and seizing it be suppressed; after his motion was denied he excepted and later objected when liquor and testimony were offered in evidence. 247 S.W. at 526.

in a criminal case of physical facts found on the person or premises of one accused of crime, ... nor to prevent oral testimony of the fact of such finding which transgresses no rule of evidence otherwise pertinent."

The Court explained:

"[W]hen the question is evidence of the possession of the accused of any property whose custody, ownership, or creation by him gives it weight in solving a crime, the method or manner by which such proffered testimony came before the court cannot be raised by attempted application of said section 9, art. 1, supra, ... If there is sound objection to testimony otherwise material which has been found on the person or in the possession or home of the accused, such objection must rest upon some better reason than that the accused did not consent to its taking or to the entry of such premises."

*Id.*, at 529.

Concluding that part of its opinion, the Court disavowed any intent to enlarge "any claim of right to enter private premises without search warrants for purposes of search and seizure;" it professed to leave the security afforded by Article I, § 9 "as secure as the bill of rights can make it," admonishing that the right should be "held sacred by officers and good citizens," for since infringement "may be defended against to the last limit," the one who in-

trudes "does it at his peril."[16]  However, reiterated the Court:

"We again assert that we are not now deciding any question whose proper solution in any wise militates against complete preservation of every right guaranteed under the provisions of section 9, art. 1, of the Constitution, securing freedom from unreasonable searches and seizures, but are deciding questions only relating to the admissibility of evidence."

*Id.*, at 529–530.

Others were not persuaded.

Legislative reaction and response to the *Welchek* court were swift and corrective. See Judge Roberts' dissenting opinion in *Gillett v. State*, supra, at 368–369,[17] and *Dawson, op. cit.,* supra, at 196–198.[18]  It produced an exclusionary rule that was codified as former Article 727a, C.C.P. 1925 (now Article 38.23, V.A.C.C.P.) and in a separate act made it a penal offense to search without a warrant.[19]

As originally introduced the bill that became Article 727a excluded evidence obtained in violation of the Constitution or laws of the State of Texas and, concomitantly, its emergency clause declared "that there has been used against citizens of this state evidence obtained in violation of the Constitution of the State of Texas and that there is now no statute expressly forbidding the same..."[20]  By amendment after "Texas" was inserted the words "or of the United States of America."  Thus, as finally enact-

---

**16.** The same thought had earlier been expressed by the Court in *Rippey v. State,* 86 Tex.Cr.R. 539, 219 S.W. 463 (1920):

"We might further observe that it is permissible under all our laws to enter houses to search for and seize stolen property, the same not being an unreasonable search or seizure... When such entry is over objection, same can only be allowed when in accordance with prescribed forms, such as search warrants, etc.; and any person undertaking such entry without color of law therefor does so *at his peril and at risk even of life;* but such entry, if without force is not made penal by any law, and, when by reason thereof the finding of stolen property results, the fact of such finding is probable, and, if it affects the accused, he may not avoid this merely by asserting that he gave no consent to such entry." *Id.,* 219 S.W. at 467.

**17.** "We have expressly noted that the intent of the 39th Legislature was to change the *Welchek* rule when it enacted two statutes, one of which was the predecessor of Article 38.23. *Odenthal v. State,* 106 Tex.Cr.R. 1, 290 S.W. 743, 748–749 (1927)."

**18.** "Thus, the legislature in 1925 enacted two distinct provisions in response to *Welchek,* one making a warrantless search a criminal offense and another excluding evidence illegally seized."

**19.** See former articles 4a and 4b, C.C.P. 1925, which would be repealed in 1929.

**20.** Acts 1925, 39th Leg., ch. 49, p. 186, § 2.

ed, the statutory exclusionary rule required Texas courts to hold inadmissible any evidence obtained in violation of State *or* Federal Constitutions *or* laws.[21]

The statutes quickly affected the Court.[22] One of the first cases providing the Court with an appropriate opportunity to examine them is *Odenthal v. State,* 106 Tex.Cr.R. 1, 290 S.W. 743 (1926, 1927).[23] The conviction was for unlawful transportation of intoxicating liquors, the offense having occurred prior to the effective date of the 1925 enactments. On original submission an opinion handed down March 24, 1926 took notice that Articles 727a and 4a were in effect at time of trial, but the Court did not deem it necessary to discuss them "for the reason that the search and seizure revealed by the present facts seem authorized by both the state and federal laws," *id.,* 290 S.W. at 745. A state statute was cited for the former and the Court pointed to a part of the opinion in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 68 L.Ed. 543 (1925), for the latter.

On rehearing, however, the judgment was reversed January 12, 1927.[24] Each Judge wrote a separate opinion. The leading one by Presiding Judge Morrow revisited *Carroll v. United States,* supra, referred to decisions of other states and, finding on the subject of "probable cause" that "the uniform rule controlling the state courts in the holding the seizure legal, as well as those holding it illegal, is in consonance with the announcement in *Carroll v. United States,* supra," Judge Morrow concluded:

> "Evidence of facts showing 'probable cause,' as named in the Constitution and statute and defined by the courts, is wanting. As the record comes before this court, it is void of any foundation for the search other than mere suspicion, and was therefore contrary to the provisions of the Fourth Amendment to the federal Constitution, and to section 9, article 1, of the state Constitution."

*Odenthal v. State,* supra, 290 S.W., at 748.[25]

With the opinion on rehearing in *Odenthal* the Court also delivered opinions in

---

**21.** In 1929 the Legislature deleted any reference to "laws" of the United States.

**22.** During the period of 1926–1928 Dawson has counted at least thirty four reversals bottomed on Article 727a, thirty two of which were prohibition cases. He also points out that in 1929, "despite the flood of reversals under article 727a, the legislature refused to repeal the exclusionary rule and instead reenacted it with only a minor narrowing of its scope," *id.,* at 201–202.

(The "noble experiment" was failing fast: Repeal of the eighteenth amendment was just around the corner.)

**23.** The Court twice refused to apply the exclusionary rule to illegally obtained evidence admitted in trials of the same accused before the effective date of Article 727a, and continued to adhere to the *Welchek* formulation. *Harrison v. State,* 102 Tex.Cr.R. 385, 278 S.W. 430 (1925); and *Harrison v. State,* 103 Tex.Cr.R. 21, 279 S.W. 455 (1926); see also *Chandler v. State,* 103 Tex.Cr.R. 311, 280 S.W. 817 (1926).

**24.** Meanwhile, a conviction for possession of intoxicating liquor for sale had been reversed in an opinion by Judge Lattimore because the affidavit on which the search warrant was sworn to by one person, when the statute required two, and nothing in the affidavit showed that the private dwelling to be searched was

used for any purpose other than that. Without even identifying it, Judge Lattimore wrote:

> "The search was on July 23, 1925. The statute rejecting evidence obtained by any officer by illegal search went into effect June 19, 1925. Giving application to said statute, under the above facts, it seems obvious that the learned trial judge fell into error in admitting the testimony for which error to judgment must be reversed."

*Foster v. State,* 104 Tex.Cr.R. 121, 282 S.W. 600 (1926).

**25.** Judge Morrow then went on to find that "the obvious purpose of the Legislature" in enacting what became Article 727a and the other statutes was "to change the rule of evidence announced by this court in the case of *Welchek v. State...,*" *id.,* 290 S.W., at 748, and applied them to exclude fruits of the search at issue. Judge Hawkins concurred, while Judge Lattimore dissented.

The next week Presiding Judge Morrow and Judge Hawkins reversed roles: Judge Hawkins wrote the lead opinion that is practically a mirrorimage of the new law Presiding Judge Morrow had pronounced in *Odenthal* with respect to *Welchek* being changed by the Legislature; Presiding Judge Morrow concurred; Judge Lattimore continued to dissent. *Sherow v. State,* 105 Tex.Cr.R. 650, 290 S.W. 754 (1927).

*Battle v. State,* 105 Tex.Cr.R. 568, 290 S.W. 762 (1927) and *Whitworth v. State,* 105 Tex. Cr.R. 641, 290 S.W. 764 (1927); both upheld automobile searches upon a finding of probable cause within the meaning of Article I, § 9. *Battle v. State* first stated that definition the Supreme Court of Texas had borrowed from Minnesota and used in *Landa v. Obert,* supra, then pointed again to parts of *Carroll v. United States,* supra, and reiterated what had been noted in *Odenthal:* the "uniform rule controlling the state courts ... is in consonance with the announcement"' in that case, which was again paraphrased. *Whitworth v. State,* supra, applies only the *Landa v. Obert* formulation, *viz:*

> "[A] reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the automobile is in use for the unlawful transportation of intoxicating liquor." *Id.,* 290 S.W., at 764.

Both *Battle v. State* and *Whitworth v. State,* supra, were written by Presiding Judge Morrow. Two weeks later in *Straley v. State,* 106 Tex.Cr.R. 130, 290 S.W. 766, 768 (1927), a warrantless automobile search producing intoxicating liquor was confirmed because made on probable cause; the Commissioners' Decision cited *Battle* and *Odenthal v. State,* supra. Similarly, February 9, 1927 the Court rendered an opinion written by Presiding Judge Morrow, agreeing that there was probable cause for a stop and search of an automobile and seizure of intoxicating liquor within the meaning of *Landa v. Obert,* supra; Judge Morrow alluded to the "discussion" in *Odenthal,* quoted from *Carroll v. United States,* and referred to *Battle v. State,* su-

pra, and its finding of the "uniform rule controlling the state courts" et cetera, and affirmed the judgment. *Plant v. State,* 106 Tex.Cr.R. 330, 292 S.W. 550 (1927). He also wrote *Moore v. State,* 107 Tex.Cr.R. 24, 294 S.W. 550 (1927), in which the Court approved an arrest without a warrant since it was justified by probable cause as defined in *Landa v. Obert,* supra, and directed the reader to "see" *Battle, Carroll v. United States* and *Odenthal, id.,* 294 S.W., at 551. See also *Hunter v. State,* 108 Tex.Cr.R. 337, 300 S.W. 63 (1927).

Without belaboring the point that those 1927 decisions upholding or overturning warrantless arrests, searches and seizures firmly established in Article I, § 9 of the Bill of Rights of this State the *Landa v. Obert* definition of "probable cause" [26] while also recognizing a similar federal definition under the Fourth Amendment, *Hurst v. State,* 111 Tex.Cr.R. 245, 13 S.W.2d 95, 96 (1928, 1929), I suggest that in doing so the Court generally—and in *Crowell v. State,* supra, upon which the plurality now relies, the Court particularly—engaged in the very kind of examination mandated by the Legislature. That is, it looked to see whether evidence to which objection was made had been obtained in violation of the Constitution or laws of the State *or* of the United States, respectively. I further suggest that its application of the new statutory exclusionary rule of evidence gave robust vitality to Article I, § 9, independently of the Fourth Amendment, and that it remains viable in its own right.[27]

The sophistry indulged in by the plurality would have this Court, and also the courts of appeals, await some kind of "mandate"

---

**26.** There are literally scores of like decisions reported in volumes 295 and 296 S.W. Early the following year, a Commissioners' Decision found trial error in admitting fruits of a comparable search and seizure for want of probable cause, quoting from *Battle* and the full definition of *Landa v. Obert. Gunther v. State,* 109 Tex.Cr.R. 408, 4 S.W.2d 978, 979 (1928). See also *Silver v. State,* 110 Tex.Cr.R. 512, 8 S.W.2d 144, 146 (1928).

**27.** That our conclusion on original submission may not be justified by prior opinions of the Court relative to "probable cause" for seizures under state law—compare *Rochelle v. State,* supra, with *Tendia v. State,* 111 Tex.Cr.R. 627, 13 S.W.2d 849, 851 (1927) (Opinion on Rehearing) and *Walker v. State,* 136 Tex.Cr.R. 460, 125 S.W.2d 1047 (1939)—poignantly attests to the separate life of Article I, § 9. They were all decided long before *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

to interpret and construe provisions of the Constitution of this State, especially its Bill of Rights, in our own lights. Meanwhile, we are to "continue on this path," following steps that two Justice of the Supreme Court of the United States say are "toward 'balancing' into oblivion the protections the Fourth Amendment affords," *Michigan v. Long,* —— U.S. ——, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (Brennan, joined by Marshall, dissenting).

Merely to parrot opinions of the Supreme Court of the United States interpreting the Fourth Amendment is to denigrate the special importance our Texan forebearers attached to their rights to privacy and other guarantees vouchsafed by the Bill of Rights they first declared and then insisted on retaining in every successive constitution. The legislative reaction to *Welchek* in 1925 —surely a "groundswell," if not a tidal wave sweeping over the Judicial Department—and its response to the tides of reversals in 1929 are statements of public policy that the Legislature not only reiterated but also additionally implemented when it enacted the current code of criminal procedure. Article 38.23, V.A.C.C.P., and see Special Commentary and Historical Note following. All of that is "mandate" enough for this Court to function in the role constitutionally assigned to it and each of us who serve it.[28]

Accordingly, while answers given by the plurality may well be correct, I completely reject its reading of *Crowell v. State,* supra, and its gratuitous abdication of the duties and responsibilities of this Court.

Therefore, I join only the judgment of the Court.

ONION, P.J., and MILLER, J., join.

TEAGUE, Judge, dissenting.

This case is before this Court on remand from the Supreme Court of the United States. See *Texas v. Brown,* —— U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). In its role as the final arbiter of what meaning the Fourth Amendment to the

Federal Constitution will have, the Supreme Court held in *Texas v. Brown,* Id., that this court in *Brown v. State,* 617 S.W.2d 196 (Tex.Cr.App.1981), had erroneously interpreted the Fourth Amendment to the Federal Constitution, and remanded the cause to this Court.

Had the plurality on remand simply held that under both the Federal and State Constitutions, as well as Art. 38.23, V.A.C.C.P., that for the plain view doctrine to be applicable to a seizure, the law enforcement officer who makes the seizure must only be legitimately in a position to view the object seized, and the contents of the object need not be immediately apparent to him, I would have been content to have simply had my dissent noted. To have done more would have been a waste of time because, as seen by this Court's recent decisions of *Hankins v. State,* 646 S.W.2d 191 (Tex.Cr. App.1981); *Ex parte Mc Williams,* 634 S.W.2d 815 (Tex.Cr.App.1982); *Faulder v. Hill,* 612 S.W.2d 512 (Tex.Cr.App.1981), at the present time the criminal law of this State, subject to Federal review and intervention, is determined by the predilections of at least five members of this Court.

But because the plurality raises extremely important questions, which concern the independence of the appellate judiciary of this State, I must write.

I have concluded that none of the opinions which have been written after the remand come to grips with the two foremost questions now before this Court: What role shall this and the other appellate courts of this State play in interpreting the Constitution and laws of this State, where they do not conflict with interpretations the Supreme Court has given to the Federal Constitution and Federal laws? Is this Court going to abdicate its position as the final arbiter in the field of criminal law on interpretation and enforcement of the Texas Constitution and the laws of this State, where such does not conflict with interpretations by the Supreme Court of the Federal Constitution and Federal laws?

---

**28.** See, e.g., *Howard v. State,* 617 S.W.2d 191  (Tex.Cr.App.1981).

The plurality opinion appears to state that after this Court has once handed down a decision which has interpreted a provision of the Texas Constitution, then such interpretation is forever binding on this Court, as well as the intermediate appellate courts of this State, and such decision may never again be questioned until a Constitutional Convention can be assembled. This is pure hogwash.

A constitution of any nation or state is originally written in broad fashion so that it will be workable in an undefined and expanded future. It is thus written in such a fashion that its provisions may be interpreted and reinterpreted in the future by an independent appellate judiciary, without the necessity of calling a Constitutional Convention to amend the Constitution every time a change is mandated. And because both law and society are mutable, interpretations and reinterpretations of the provisions of the constitution are usually necessary. This is why an independent appellate judiciary has been granted such awesome power, with which goes a tremendous amount of responsibility.

In 1787, the leaders of the state governments gathered in Philadelphia and drafted a Federal Constitution, which became effective on September 17, 1787. Subsequently, ten amendments to that Constitution were added, and declared in force on December 15, 1791. Since then, only 16 amendments have been made to the Federal Constitution, which speaks highly of its drafters. The first ten amendments are commonly referred to as "The Bill of Rights." However, the Constitution and its amendments are only limitations on the power of the Federal Government.

Prior to the 1930's, there was not much federal legislation or interest in the rights, liberties, or freedoms of persons in these United States, and hence no occasion for invoking and applying to persons in the United States the Federal Bill of Rights. Whatever there was of such legislation by the States, it was untouched by the Federal Bill of Rights; for under *Barron v. Baltimore,* 7 Pet. (32 U.S.) 243, 8 L.Ed. 672 (1833), it was settled that the Federal Bill of Rights contained no general limitation on the power of the States. Thus, the citizens of the States were not to benefit from the Federal Bill of Rights except only in the instance of their relationship with the Federal Government. The general preservation of individual rights was left to the State governments and their independent appellate judiciaries.

It was not until the 1930's when the question, whether a specific protection, good against the National Government, holds good also against a State, commenced to be answered by the Supreme Court. See *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Also see *Adamson v. California,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947); and cf. *Twining v. New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908).

By the process of interpreting and reinterpreting the Fourteenth Amendment's due process clause, the Supreme Court in the late 1960's reached the height of its leadership as the role maker and champion for individual rights, when it made applicable to the States, by way of the due process clause of the Fourteenth Amendment to the Federal Constitution, many of the provisions of the Federal "Bill of Rights."

Today, however, we are witnessing the Supreme Court of the United States in a reverse role. By its decisions, it appears to be abdicating its position as the role maker and champion of individual rights. In sum, we are seeing a desire on the part of the Court for a return to the "good old days," which, presumably, is a return to the criminal law as it existed prior to 1930.

Henceforth, persons of this country must look to their State legislatures and their independent appellate judiciaries for whatever rights, liberties, and freedoms they want to have.

The plurality opinion's implicit conclusion that this Court may not re-examine a prior opinion of this Court which has interpreted the Texas Constitution, because such would constitute amending the Constitution of the State of Texas, is based upon its erroneous

interpretion of what this Court stated in *Crowell v. State,* 147 Tex.Cr.R. 299, 180 S.W.2d 343 (1944).

Contrary to the impression the plurality attempts to leave with the reader, what the Court actually held in *Crowell v. State,* supra, a bawdyhouse case, was (1) the act of the State's witnesses standing outside the defendant's residence and peering through an open window of the defendant's residence, where they witnessed an act of sexual intercourse occurring inside the residence, did not constitute any search of the defendant's residence pursuant to the Fourth Amendment to the Federal Constitution; (2) the State's witnesses did not violate Art. 1, Sec. 9, of the Texas Constitution, when they peered at the parties through the open window; and (3) the State's witnesses did not violate the provisions of what is now Art. 38.23, V.A.C.C.P., by being trespassers on the premises.

Although I can understand the application of the plain view doctrine to the facts of this cause, nevertheless, I am unable to understand the majority opinion's rationalization for its conclusion that *Crowell v. State,* supra, stated that this Court is precluded or prohibited from making the independent determination of whether a provision of the Texas Constitution should control the disposition of this case, "until such time as we are statutorily or constitutionally mandated to do otherwise." *Crowell* did not state or hold that, and the majority opinion is in error in leaving the impression that it did.

When the day comes, whereby this Court is forever foreclosed or precluded from reinterpreting or re-examining a prior decision of this Court, or a provision of the Constitution of this State, then we might just as well close and lock the doors to the Court of Criminal Appeals of the State of Texas.

I acknowledge that the members of this Court are bound, as are the members of any other state appellate court, by the interpretations that the United States Supreme Court has given to any provision of the *Federal* Constitution. This is mandated by Article III of the United States Constitution. However, State appellate courts are now and have always been free to interpret their respective constitutions in any way they see fit, and to give to the provisions of their State Constitutions a broader interpretation and meaning than what the Supreme Court might give to them. See *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).

This is not the first time in its history that this Court has erroneously interpreted the Federal Constitution. In fact, the Supreme Court of the United States has in the past reversed so many of this Court's decisions for erroneously interpreting the Federal Constitution that a compilation of those decisions would make an excellent compendium of Federal Constitutional law. And I predict, if for no other reason than that the members of this Court are human, that this Court in the future will again erroneously interpret the Federal Constitution.

I was not a member of the panel which decided *Brown v. State,* supra. I must confess, however, that when the cause was presented to the En Banc Court on State's motion for rehearing, after reading and studying the panel decision I did conclude that in reaching its result the panel was applying to the case both the Federal and State Constitutions. Because I believe that if not under the Federal Constitution, then under either the Texas Constitution or Art. 38.23, supra, the seizure was unlawful, I voted to overrule the State's motion for rehearing.

However, in its decision of *Texas v. Brown,* supra, the Supreme Court informed us that this Court's panel opinion was predicated not upon an independent state ground, but, instead, upon case law which had interpreted the Federal Constitution. Thus, in reconsidering the issue that is in this case, this Court is bound, as far as Federal Constitutional law goes, by the holding in *Texas v. Brown,* supra.

Even though the Supreme Court disposed of the search and seizure issue that is before this Court on remand on the basis of Federal Constitutional law, the matter is

not ended. "[T]he question remains for us to decide whether [the search and seizure] offends any of the provisions of our own constitution and we are under no compulsion to follow the United States Supreme Court in that regard." *State v. Opperman,* 247 N.W.2d 673, 674 (S.D.Sup.Ct.1976).

I find the following statements that were made by the Supreme Court of South Dakota in *State v. Opperman,* Id., most helpful to what I am trying to state:

There can be no doubt that this court has the power to provide an individual with greater protection under the state constitution than does the United States Supreme Court under the federal constitution... This court is the final authority on interpretation and enforcement of the South Dakota Constitution. We have always assumed the independent nature of our state constitution regardless of any similarity between the language of that document and the federal constitution ... we have the right to construe our state constitutional provision in accordance with what we conceive to be its plain meaning. We find that logic and a sound regard for the purposes of the protection afforded by S.D. Const., Art. VI, Sec. 11 warrant a higher standard of protection for the individual in this instance than the United States Supreme Court found necessary under the Fourth Amendment.

Contrary to the plurality, I feel that this Court should do what I believe the brethren of the Black Hills did in *State v. Opperman,* Id., and that is to reaffirm that this Court and all appellate courts of this great State of Texas constitute an independent appellate judiciary, and do not exist, when it comes to interpreting the Constitution and laws of this State, solely to mimic decisions of the Supreme Court of the United States.

In some quarters, this might be called re-writing a prior opinion of this Court. However, as the author of the majority opinion in this cause recently demonstrated in *Ex parte Girnus,* 640 S.W.2d 619 (Tex.Cr. App.1982), such re-writing of a prior opinion is not necessarily called "a rewriting of the opinion," but, instead, is merely a statement in written form that the prior opinion of the Court was erroneous. Also see *State v. Opperman,* supra; *State v. Kennedy,* 295 Or. 260, 666 P.2d 1316 (1983).

In this instance, appellant's counsel clearly invoked, in support of his claim that the trial court was in error in overruling his motion to suppress, a provision of the Texas Constitution, as well as Art. 38.23, supra. He expressly stated the following in the brief he filed in the trial court: "The seizure of the balloon and the arrest of the Appellant were in conflict with ... Article 1 of the Texas Constitution and Article 38.23 of the Texas Code of Criminal Procedure." In the instrument entitled "Defendant's First Motion to Suppress," he also made the same assertion. This Court, in *Brown v. State,* supra, acknowledged both assertions. Appellant has thus clearly invoked provisions of Texas law that are applicable to this cause.

Because I believe that the rights, liberties, and freedoms of persons who live in this State are greater than what the Supreme Court has granted in its interpretation of the Fourth Amendment to the Federal Constitution, I dissent to the plurality's contrary holding. The opaque party balloons that were seized in this instance were subject to the exclusionary rule. Because of Art. 1, Sec. 9, supra, and Art. 38.23, supra, they became inadmissible evidence.

To the plurality's implicit holding that the members of this Court now have the role of being nothing more than mimicking court jesters of the Supreme Court of the United States, taps should be blown, and flags flown at half-mast—on behalf of what was formerly a Court that was a part of the independent appellate judiciary of the State of Texas.